## STATE *v.* LAPAGE.

{ Aug. 11, 1876.

### *Criminal law—Evidence—Intention.*

The prosecution cannot attack the character of the prisoner unless he first puts that in issue by offering evidence of his good character.

The prosecution cannot show the defendant's bad character by showing particular acts.

The prosecution cannot show in the prisoner a tendency or disposition to commit the crime with which he is charged.

The prosecution cannot give in evidence other criminal acts of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions.

FROM MERRIMACK CIRCUIT COURT.

INDICTMENT, charging the respondent with the murder of Josie A. Langmaid, who was killed October 4, 1875, about nine o'clock in the morning, while passing over the Academy road, in Pembroke, on her way to school. Her head was severed from her body, and removed a distance of a quarter of a mile. Another part of her body, including one half or two thirds of the vagina, was cut out and carried away, and

was never recovered.   No *post-mortem* examination of the body was made, with a view to ascertaining whether the victim had been violated.

The government claimed that the murder was committed " in perpetrating or attempting to perpetrate rape."

As tending to show that the prisoner had an intent to commit such a crime, and that he was making antecedent preparations therefor, the state was permitted to show, by one *Clarence B. Cochran*, that on October 1, about half past eight o'clock in the morning, as he was passing along the Academy road on his way to school, when he arrived within about thirty rods of the place of the murder, he saw a man jump into the bushes on the side of the road.   He testified : " I only saw him pass into the bushes.   He passed into the bushes, springing, as if in haste."   He did not recognize the man.

*Adin G. Fowler* was permitted to testify to conversations with the respondent, on September 24, 25, and 26, as follows : I was to work out in front of the house on that night [September 24] sorting potatoes. Mr. Lapage came out and took hold and helped us for a few moments ; and while we were to work there my sister came home.   A gentleman brought her home, and she got out of the wagon and went into the house ; and Mr. Lapage wanted to know who that was, and I told him ; and he wanted to know then if she had been to Suncook.   I told him no, she had been to school.   Then he wanted to know which way she went to get there, and I told him, as well as I could, how to go, and pointed out toward the academy, that way (pointing), and he said that that must be the same way that he came when he came out to Mr. Kimball's ; and that was all that was said that night.

＊          ＊          ＊          ＊          ＊          ＊          ＊          ＊

The next night—Saturday night—I went to carry him part of the way home.   I carried him down Buck street as far as the house of Mr. Locke, and when we got down to Russ's corner he wanted to know then if there is where my sister went to school.   I told him no, and pointed out toward the academy again, and told him two miles, or a mile and a half—I don't remember exactly, but I believe I told him a mile—" and then turn to your right and go up."   And that was all that was said that night.

＊          ＊          ＊          ＊          ＊          ＊          ＊          ＊

Saturday I carried my sister on the street, and left her there at a place where she roomed.   Then I went to Suncook and got Mr. Lapage, to bring him out.      ＊      ＊      We came down Buck street.      ＊      ＊ When we went past there [the Academy road] I remember of telling him that that is the road my sister went on when she went to school."

*Edward L. Mahair* testified that he saw the respondent while he was at work for Mr. Fowler, threshing.   While thus occupied, about a week before the murder, a young lady passed by.

＊          ＊          ＊          ＊          ＊          ＊          ＊          ＊

When the girl passed by he was threshing in the barn, and he spoke to me and asked me where that gal was going.   I told him I

didn't know. Then he asked me what her name was. I told him her name was Sarah Prentice. Then he wanted to know where she lived. I told him—went to the door, and showed him as near as I could. &ast; &ast; Then he wanted to know who was going with her. I told him I didn't know. And that is all he said that day. &ast; &ast; I was up there the next day, and was going through the barn, and he stopped me, and said, "Where did that gal go that went down by ? " I told him I didn't know whether she went into Mr. Fowler's or went further. He wanted to know who went with her. I told him I couldn't tell him ; I didn't know who went with her. Then he asked me who she was and where she lived, again, and I showed him; and then the next time he asked me who went with her, I told him I didn't know. He said he wondered which road she went on the most. I told him " I guess she goes on this road the most."

The witness then repeated an obscene and vulgar remark and inquiry made by the respondent concerning the girl.

*Hiram Towle,* and *Harriet A. N. Towle,* his wife, testified, in substance, that on Saturday, October second, about nine o'clock A. M., they were riding over the Academy road, and when about fifty or sixty rods from the place of the murder they met the respondent carrying a stick behind him. The stick was described as being similar in all respects (about three feet long, four-sided, about one and a quarter inches square, whittled at one end for a handle) to a stick produced in court, which had been found, broken and stained with blood, near the place of the murder.

*Alversia Watson* testified as follows: I live in Allenstown. Have a son and two daughters ; my youngest daughter is attending school at Pembroke academy ; did not attend school last fall, but taught in Hooksett; I go over Chester turnpike to get there ; she came home Friday nights, and went back Sundays ; first part of term she walked ; I went with her—generally went about a mile and three quarters. Saw Lapage on that road once, in the last part of September, on Sunday ; saw him standing about a mile from my house beside the road, opposite some bushes ; my daughter was with me ; noticed nothing in his hands when I first saw him. Saw him again about half a mile further on ; he was coming towards me ; this was two weeks before I heard of the murder ; he had something in his hand the second time I saw him ; it was a stick, or cane ; think that the stick was a newly cut stick ; think it was larger than the stick found in the woods of the murder ; had it in his right hand. The second time I saw him he was coming along behind me, about a hundred feet ; I watched him by looking behind me; was about twelve feet away when I last saw him ; he was moving rapidly toward me, partly running ; my daughter was very much frightened, and was crying ; it was between four and five in the afternoon when I saw him the first time; saw him next time half a mile further on in the road, following on after me; had been walking ; turning to look at my daughter, saw a man picking berries on top of a hill ; when I turned to look at my daughter, saw Lapage going into

the bushes; went about half a mile further with my daughter; sat on top of the hill till I thought my daughter had got out of hearing—about fifteen minutes, I think; George Mack [the man who was picking berries] waited, and came home with me. The person I met with a club was Lapage, the prisoner.

Cross-examination. My daughter and I were going to Hooksett; it was on Sunday; it is four miles from my house to where she taught school; went with her about two miles; there are chestnut woods along the road; first saw the man about a mile from home, he was just outside of the road; he was about fifty feet away then, standing still; did not see him again until I had passed the place, and turned back and saw him again; he stood still till I passed out of his sight by a turn in the road; it was two or three minutes' walk before I got out of sight of him; went with my daughter more than a mile; went nearly half a mile before I saw him again; he was coming in the road; could have seen a man quite a little distance; when I saw him last he was partly running towards me, and came to within a few feet of me; saw the man picking berries there, near Lakin's shanty, a short distance away; saw no one else but Mr. Mack's little boy; the man with the stick went into the woods on the opposite side from where Mr. Mack was. The man I saw was not very tall, with black whiskers, tan-colored overalls, and gray mixed coat. Wore a dark hat. Next saw the man in jail; can't tell when; went there at the request of Mr. Hildreth; he mentioned no name of any one at the jail, but wished me to go and see if there was any one there that I had seen before. Mr. Hildreth, Hattie Gault, and some others went to the jail with me; Mr. Sargent asked me to go and look in every cell and see if there was any one that I had seen there; went in, and when I saw Lapage, knew him at once by his looks and features; did not notice Lapage's moustache when I met him in the road; don't think his beard was as long in jail as when I saw him in the road.

Re-direct. My attention was called to some clothing at the jail, and I picked out a coat that I thought was like the one he wore. [Coat shown, and thought to be the same by witness.]

*Matthias Mercy* testified as follows: I know Annie Watson; saw her on Chester turnpike one Sunday last September; saw her about two and a half or three miles from Suncook saw-mill; was in the road when I met her; had not seen her before; said nothing to her; sat down on a rock beside the road; saw Lapage while I sat there; I knew Lapage before; he was running towards the girl; when he came up to me he faced towards me; his face was red and excited; he had been running half a mile, and more too; he never said anything to me; he looked right towards her; he slacked up a little, and then started off on a run; don't know whether he saw me or not.

Cross-examined. I had seen Lapage before I saw him in the road; saw him in his house in Potter's block; saw him in the road on Sunday—the last Sunday in the month; saw a man and woman that day; their names were Palmer; they live in Allenstown; saw them when I

was going up, and the girl when I came back ; went up as far as Lakin's hill, turned, and came back ; it is about two miles from Suncook to Lakin's hill ; saw Lapage as I was coming back from Lakin's, about five o'clock at night ; met the Watson girl the other side of Lakin's hill ; I walked about a quarter of a mile and sat down ; heard Lapage running in half a minute ; saw Lapage walk up the hill, and begin to run when he reached the top ; this was after he passed me.

*Anna A. Watson* testified that she was the daughter of Mrs. A. Watson, and taught school in Hooksett last September ; came home Friday nights and returned Sunday nights, usually.  On Sunday night, a fortnight before Josie Langmaid was killed on Monday, she met two persons on the road ; met T. Marcy on the road ; she and her mother were followed by a man that Sunday ; he was in the bushes, partly bent over, and she noticed he had dark whiskers.  As they were going up the hill by a shanty she looked back and saw the man again, coming after her, some ways from where she first saw him, and he was on the side of the road, as near as across this room ; he had a stick in his hands, travelling fast ; he was walking, and he nearly overtook us. She was so frightened that she thought she would go up the hill as soon as possible, and in a few minutes she saw Mr. Mack ; the man disappeared in the woods, and she did not see the man ; he went into the woods again ; after her mother left her she ran ; she could not identify the man, she was so frightened at the time.

*Julienne Rousse* testified that she resided in Joliet, Canada, and was a sister of Joseph Lapage's wife, and knew him ; saw him last four years ago last June, before seeing him in Concord ; saw him at her home in Desier Marion.

Went to a pasture to milk cows while living at St. Beatrice, Canada, and met Lapage there ; when I arrived at the pasture the cows were not there ; Lapage was above in the pasture, with a buffalo robe mask on his face, a home-made faded red shirt, and pair of linen pants, with a leather belt around him, and a pine root in his hand the size of her arm, and about three feet long ; he was four or five rails from her. A rail is ten feet ; the place was not in sight of any house ; it was seven o'clock in the morning, June, 1871 ; he tried to catch her ; she shouted and tried to run away ; after she had gone four or five rails he overtook her, caught hold of her, and she turned round and pulled the mask off of him and recognized Lapage by his face ; he then rolled his head into her skirt and tried to choke her.  After he choked her she turned on her belly, and then he rubbed coarse sand into her eyes and mouth ; after she was choked and lost her strength he outraged her ; lost her strength and mind, and did not know when he left her ; she was gone two hours before she reached the house, which was ten acres away, or about one third of a mile ; he did not strike her with the stick, but committed rape upon her ; after coming to, she went to her home.  He choked her throat with his hand, which left black marks upon her throat.  The marks were upon her throat for a month, and her neck was very black where his fingers were, and for a month she

had great difficulty in eating and drinking; was twenty-seven years old, and never married; Lapage was married at that time, and lived twenty-five or thirty acres from her home; saw Lapage the next day, but had no conversation with him; was living with a Mr. Marion then; had never seen or spoken to him since; he went to the United States at once.

Cross-examined. First talked of the outrage upon her to Joseph Lajeunnesse and his daughter, the same day at nine o'clock, they being at Marion's house at the time. Three children of Marion, the oldest seven years old, and Lajeunnesse's family, were the only ones in the house; couldn't tell where the Lajeunnesse family now lived, except that it was in a place called Acton; they left St. Beatrice three years next March, she thought; next talked of the outrage with Mr. Marion and his wife, at three o'clock the same afternoon; employed no doctor for her injuries; Lapage first seized her by her throat. After she was down on the ground, he grabbed her by the back to throw her down, and attempted to commit the outrage, when she screamed, and he seized her throat. He turned her over after he choked her, and this was after the sand was put into her eyes and mouth, at which time she was sensible; but she lost her senses when he committed the outrage, and did not know when she recovered her senses, but was gone two hours before she got back to the house. She pulled the mask off so far as to see his eyes, and she knew the man before she pulled the mask from him. The mask was tied with two black strings, and she pulled it down so she saw his forehead; had a hat on when she first saw him, and when she grabbed his mask his hat fell off. He tried to murmur a few words of English, so as to disguise himself. She understood that Lapage knew that she knew him, and so tried to disguise himself by attempting to talk English. She had no talk with him, but screamed; Lapage had a farm, and worked on it, which belonged to Edward Perrault. Spoke to Edward Perrault about the outrage upon her. She asked him if Lapage was at home, and he said he was not, but had started for the states. She never said to Perrault that she did not know who it was that assaulted her, and had no conversation with him about the outrage.

To the admission of all the foregoing testimony the respondent excepted.

*Hattie M. Gault* testified as follows: Lived on Pembroke street, a half mile this side of the academy, and attended that school October 4, and reached the school about 8.30 that morning; bells rung at 8.25 and 8.55 o'clock; stood in the door of the academy and saw Lapage pass the building, and was as confident of it as she could be; he had an axe on his shoulder, and turned down the Academy road, and she watched him as far as she could see him on that road. Next saw him at the jail, and identified him as the man who passed the academy.

Concerning the foregoing evidence, the court charged the jury as follows:

"You have heard the testimony of Julienne Rousse to the effect that

in June, 1871, this prisoner committed a rape upon her. In considering this evidence (if you believe the witness), you will be required to use careful discrimination of the way and manner in which it is to be applied to this case, if it is to be applied at all.

"We have admitted the evidence, not because it is *necessarily* connected with the issue which you are to try,—which is, the guilt or the innocence of the prisoner of the offence with which he is *here and now* charged,—but because it *may* have a legal bearing upon that issue in the way which I shall endeavor to explain, and to which I invite your most careful attention. It may be your duty to reject the evidence entirely, and put it out of the case, and out of your minds. It may be your duty to consider it. It is a fundamental principle of law, that evidence that a defendant committed one offence cannot be received to prove that he committed another and distinct offence. This principle we must take care not to violate. And, therefore, you are not to regard the evidence of Julienne Rousse as any proof or evidence that the prisoner killed Josie Langmaid. Therefore, unless you find from *other* evidence, entirely independent of that of Julienne Rousse, that the prisoner killed and murdered Josie Langmaid, you must reject her evidence altogether.

"The evidence is open to your consideration, if at all, only so far as it may seem to you to bear upon the *character* of the homicide of Josie Langmaid ; only as it may bear upon the question whether she was murdered by the prisoner in perpetrating or attempting to perpetrate rape.

"Our statute declares that 'All murder committed by poison, starving, torture, or other deliberate and premeditated killing, or committed in attempting to perpetrate arson, rape, robbery, or burglary, is murder of the first degree ; and all murder not of the first degree, is murder of the second degree.'

"'And if the jury shall find any prisoner guilty of murder, they shall by their verdict find also whether it is of the first or second degree.'

"If you find, from other evidence in the case than that of Julienne Rousse, that the defendant killed Josie Langmaid deliberately and premeditatedly, or in perpetrating or attempting to perpetrate rape, you may and your duty is to reject her testimony altogether. But if you are not so satisfied by all the other evidence and circumstances of the case, you may consider her evidence. I need hardly say that you must be satisfied upon this point, that the prisoner is the man who committed the rape upon Julienne Rousse.

"The evidence you see, therefore, bears only upon the question of the *intention* of the prisoner in killing Josie Langmaid, and thus upon the *degree* of guilt, *i. e.*, whether the offence is murder of the first or second degree.

"Now, ' the unlawful intent in a particular case may sometimes be inferred [not necessarily, but it *may* be inferred] from a similar intent proved to have existed in previous transactions.'

"The principle upon which such evidence is admitted is, that,

' though the prisoner is not to be prejudiced in the eyes of the jury by the needless admission of testimony tending to prove another crime, yet, whenever the evidence which tends to prove the other crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time when he did the act complained of, it is admissible.'

" If, in this case, you find it necessary to show the commission of, or the attempt to commit, a rape upon Josie Langmaid, in order to find the prisoner guilty of murder in the first degree, and the evidence of the mutilation and concealment of the private parts of her body are not sufficient to satisfy you of that fact, then you may inquire what other motive induced him to kill her.

 " Does the testimony of Julienne Rousse, or any other evidence in the case, tend to show the existence in the mind of the prisoner of a motive or passion which would render the commission of, or an attempt to commit, a rape upon Josie Langmaid more probable than it would otherwise seem to you ? Does it or not tend to show that such a lustful intent existed in the heart of the prisoner at the time as would render the commission of a rape more probable ? Does this evidence supply a motive for the commission of the offence ?

" The crime committed upon Julienne Rousse was four years and more antecedent to the offence under consideration. Since that time a change may have taken place in his mind. There has been time for repentance; and the lustful disposition he bore then may have been eradicated. The more remote the evidence of this mental condition, the less force and weight belong to it.

" But in connection with this part of your inquiry, i. e., concerning the present intention, and whether a lustful disposition still remained in the prisoner's heart, you may consider the evidence of Adin G. Fowler, of the prisoner's inquiry on three different occasions concerning Fowler's sister, and where she went to school, and the road she took to get there (within a fortnight of the murder) ; of young Mahair concerning Sarah Prentice—the way she travelled, and the obscene remark concerning her; of Mrs. Watson, her daughter Anna, and Matthias Mercy, concerning his pursuit of Anna, about two weeks before the murder.

"And here it is proper to remark, that if the prisoner killed Josie Langmaid, it is not at all necessary that any lustful desire or any animosity toward her in particular should be shown, provided she became the victim of his lustful and murderous intent. If the intent to commit rape and murder upon some one else, or upon any girl whom by chance he might encounter, was consummated in an attack upon Josie Langmaid, the indictment is sustained."

No exceptions were taken to the charge.

The respondent was convicted of murder in the first degree, and sentenced to be hanged.

The respondent tendered this bill of exceptions, which was allowed ; and, in transferring the same for the consideration of the superior

court, the circuit court reserved and transferred all questions as to the exercise of discretion. Transferred by FOSTER, C. J., C. C., and RAND, J., C. C.

*Lewis W. Clark, attorney-general* (with whom were *W. W. Flanders, solicitor,* and *C. P. Sanborn),* for the State.

There were two questions for the jury: 1st, Was the defendant the person who killed the deceased ? 2d, If he was the slayer, did he kill her in perpetrating or attempting to perpetrate rape ? No exceptions were taken to the charge. Under an unexceptionable charge, and upon other testimony than that of Julienne Rousse, the jury have answered the first question in the affirmative.

I. The only question of law raised by the bill of exceptions is, whether the evidence objected to is admissible for any purpose. Does this evidence have a legal tendency to show that the defendant killed the deceased, or that he intended to commit a rape upon her ?

The burden was on the State to prove the first degree of murder. Unless the State proved that degree beyond all reasonable doubt, the defendant could not be found guilty of that degree. The degree was as distinct and separate a point to be proved by the State as the fact that there was such a person as Josie Langmaid, the fact that she is dead, the fact that she died a violent death, the fact that her death was not accidental, the fact that she did not commit suicide, or the fact that the defendant is the person who killed her. In cases of this kind we are apt to lose sight of the wide gulf between the proved homicide, and the necessity of proving the degree of it. We are apt to take it for granted that such a homicide as this apparently was, was a murder of the first degree ; that there is no need of any evidence on the question of degree, and that the jury will find the first degree if they find homicide. And when we infer the degree from the sex and age of the deceased, and the peculiar mutilation of her person, we are apt to confound the duties of court, counsel, and jury ; to presume that the jury must draw the same inference that we draw, and to think that counsel need not offer, and that the court may safely reject, all distinct and independent evidence on the question of degree. But counsel cannot argue here, and the court cannot hold, that as matter of fact the jury must have found the first degree from the evidence of sex, age, and mutilation. That is a question with which we here have nothing to do. The only question of law here is, whether the evidence objected to had any legal tendency to prove any material fact.

This evidence was cumulative,—that is, it tended to prove a fact or facts which other evidence also tended to prove. All evidence, except the first scintilla, on every point, is cumulative ; but all evidence except the first scintilla is not therefore incompetent.

If at the trial the court had believed that this evidence was superfluous, and was offered in bad faith for the purpose of prejudicing the jury improperly on some other points than those on which it was

254 STATE v LAPAGE.

offered, or that, on any other ground within the discretion of the court, it ought not to be received, the court would have exercised its discretionary power. But no cause for exercising that power appears here.

Had the evidence a legal tendency to prove any fact put in issue by the defendant's plea? One fact thus put in issue was his killing the deceased. Another fact thus put in issue was his killing her, not accidentally, not in self-defence, not under any of the great variety of circumstances or for any of the numerous reasons that would make his homicidal act manslaughter or murder in the second degree, but in the commission of or the attempt to commit a rape, or under any other circumstances or for any other reasons that would make his homicidal act murder in the first degree. The State, asking a conviction, not for manslaughter, or murder in the second degree, were bound to satisfy not the court, but the jury, not only that the homicide was committed by the defendant, but also that the homicide was murder of the first degree;—and of this the State was bound to satisfy the jury beyond all reasonable doubt. The court could not instruct the jury that they were bound to find, upon the evidence received without objection, that the homicide was murder of the first degree;—for error in such instructions the judgment would be reversed. Without the evidence objected to the jury might not have been satisfied, beyond all reasonable doubt, that the deceased did not die suddenly of heart disease, or did not commit suicide, or was not accidentally killed by a carriage running over her, or by a random gun-shot. In either case the dead body might have been found and mangled by some person who was innocent of her death. The defendant or some other person might have insulted her, or committed an indecent assault upon her; and in the struggle that ensued the homicide might have been murder in the second degree, or voluntary or involuntary manslaughter. The State, being bound to remove from the minds of the jury every reasonable doubt on these and all other possible points involved in the charge of murder in the first degree, had a right to introduce evidence on those points.

Since the decision in *Darling* v. *Westmoreland*, 52 N. H. 401, 403, 405, 406, it cannot be necessary, in this state, to argue or to cite authorities to show that the evidence to prove several independent propositions or distinct facts may be of different kinds and drawn from different sources; and that the rule requiring evidence to be confined to the point in issue, excluding evidence of general character and disposition, and prohibiting the trial of collateral issues, is merely the rule that requires evidence to be relevant, and excludes what is irrelevant; and when such evidence is admitted, it is admitted not because it is evidence of character or disposition, or of such other transaction, but because the character, disposition, or transaction is relevant. Character, disposition, and certain innocent or criminal acts, not being the primary, express, and immediate subject of the issue, may be relevant, that is, may have a legal tendency to prove a material fact involved in the issue. And they may be irrelevant. And because they are often irrelevant, and therefore inadmissible in evidence, it is often said that

there is a rule of law that excludes evidence of other crimes than that charged, and evidence of a general disposition to commit the same kind of offence. But the books abound in cases that show there neither is nor can be any such rule. What is often erroneously called a rule of that kind is merely the application to a particular case of the rule requiring evidence to be relevant. When certain evidence tends to prove the commission of another crime than that charged, or a general disposition to commit such or any other crime, the circumstance that the act or disposition, which the evidence tends directly to prove, is criminal, is wholly immaterial. The question is not whether it is criminal, but whether it is relevant—whether it has a legal tendency to prove a fact material to the issue.

Although evidence offered in support of an indictment for felony be proof of another felony, that circumstance does not render it inadmissible. If the evidence offered tends to prove a material fact, it is admissible, although it may also tend to prove the commission of another distinct and separate offence. *Mason* v. *The State,* 42 Ala. 532, 537 ; *Kirkwood's Case,* 1 Lewin C. C. 103 ; *Com.* v. *Stearns,* 10 Met. 256 ; *Reg.* v. *Aston,* 2 Russ. on Cr. 841, 4th ed. ; 3 *id.,* 286 ; *Reg.* v. *Weeks,* Leigh & Cave C. C. 18, 21.

" The principle is, that all the evidence admitted must be pertinent to the point in issue ; but if it be pertinent to this point, and tends to prove the crime alleged, it is not to be rejected, though it also tends to prove the commission of other crimes, or to establish collateral facts." *Com.* v. *Choate,* 105 Mass. 451, 458. In *Reg.* v. *Lewis,* Arch. Cr. Pl. (14th ed.) 486, Lord DENMAN " could not conceive how the relevancy of the fact to the charge could be affected by its being the subject of another charge." Evidence of other crimes than the one charged is so frequently received on indictments for forgery and counterfeiting, and uttering forged or counterfeit papers or coins, that those classes of cases are sometimes erroneously spoken of as exceptions to the general rule of evidence. They are not exceptions. Evidence is received in all cases when it is relevant (unless it is rejected, on some ground of fact, by an exercise of judicial discretion) without reference to the question whether the facts proved are criminal or not. Its competency consists, not in the innocent character of the act which it tends to prove, but in the relevancy of that act to the issue. Evidence of other crimes is more frequently received in cases of forgery and counterfeiting than in other cases, not because those cases are exceptional in law, but because, in fact, such evidence is more frequently available in those than in other cases to prove a material fact. It is admitted to prove the guilty knowledge, the motive, or the intent, not because there is any exception or special rule of law applicable to proof of the defendant's knowledge, motive, or intent, but because his knowledge, motive, or intent is a material fact to be proved, like any other material fact, by relevant evidence.

The general rule of evidence that requires evidence to be relevant admits evidence that is relevant, and it is as applicable to murder as to passing counterfeit money.

In *Rex* v. *Voke*, R. & R. 531, it was held by all the judges, on the charge of shooting with intent to kill, that proof of shooting at the same person at another time was competent to show that the shooting charged was not accidental. In *Reg.* v. *Geering*, 18 Law Journal Mag., cas. 215, the charge was against a wife for the murder of her husband by poison. Evidence of three of her sons being subsequently poisoned was received, to show that her husband died of poison, and that his death was not accidental. In *Reg.* v. *Cotton*, 12 Cox C. C. 400, the charge was against a mother for murdering her child by poison. Evidence was held admissible to prove that two other children of hers, and a lodger in the house, had previously died of poison. In *Reg.* v. *Garner & Wife*, 3 F. & F. 681, the charge was the murder of Garner's mother by poison. His wife had lived in his family as a servant when his former wife died. His mother died of poison. Evidence was received to show that his first wife died of poison, and to show the circumstances of her death. In *Reg.* v. *Roder*, 12 Cox C. C. 630, on the trial of the defendant for murdering her infant by suffocation in bed, evidence was received tending to show the previous deaths of her other children at early ages. In *Rex* v. *Clewes*, 4 C. & P. 221, on a charge of murdering H., evidence was received to show that H. had been employed by the defendant to murder P. In *State* v. *Watkins*, 9 Conn. 47, on a charge of murdering the defendant's wife, evidence was received to show the defendant in adulterous intercourse with another woman for some months before his wife's death. *Johnson* v. *State*, 17 Ala. 618; *Hall* v. *State*. 40 Ala. 698; *People* v. *Stout*, 4 Parker Cr. 71. In *Com.* v. *Ferrigan*, 44 Pa. 386, in a trial of murder, evidence was received to show an adulterous intercourse between the defendant and the wife of the deceased.

And the general rule applies to the killing of horses as well as to murder. In *Rex* v. *Mogg*, 4 C. & P. 364, on a charge of administering sulphuric acid to eight horses with intent to kill them, evidence of the defendant's administering it at different times was received to show his intent. And the same doctrine is held in all other classes of cases, as well as those relating to the destruction of life. In *Reg.* v. *Dossett*, 2 C. & K. 306, on a charge of setting fire to a rick by firing a gun close to it on the twenty-ninth of March, evidence that the rick was also on fire on the twenty-eighth of March, and that the prisoner was then close to it, having a gun in his hand, was received to show that the fire on the twenty-ninth was not accidental. On the question of accident the evidence would have been relevant if it had related to another rick belonging to another person. On a charge of setting fire to the defendant's house, with intent to defraud an insurance company, evidence that the defendant had insured in other offices two other houses in which he had lived that were burned, and that he received the insurance money from the other companies, is relevant as tending to show that the fire in question was intended, and not accidental. *Reg.* v. *Gray*, 4 F. & F. 1102.

The question of accidental death in the present case was one upon

which the state was bound to satisfy the jury beyond all reasonable doubt, and therefore one on which the State had a right to introduce evidence. Mere proof that the defendant killed the deceased would be perfectly consistent with murder in the second degree, or manslaughter, or the defendant's entire innocence. He might have killed her in self-defence, or accidentally, and without fault on his part. The State, asking for a conviction of murder in the first degree, was bound to prove beyond all reasonable doubt not only that he killed her, but also that the homicide was " murder committed by poison, starving, torture, or other deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary."

Under an indictment for arson, evidence of two previous and abortive attempts to set fire to the same premises, though there was no evidence that they were made by the defendant, was admitted to show that the last fire was not accidental. *Reg.* v. *Bailey*, 2 Cox C. C. 311. In *Reg.* v. *Proud*, Leigh & Cave C. C. 97, 101, the charge was embezzlement by the defendant as clerk, who made false entries in his book of the amounts by him received. It was held (by Pollock, Wightman, Williams, Martin, and Channell) that the book was evidence generally, that not only the false entries bearing directly upon the three charges in the indictment, but also other similar false entries, were competent evidence. *Reg.* v. *Richardson*, 2 F. & F. 343, was a charge of embezzlement against a clerk who made out weekly accounts of his payments. On three occasions within six months he entered the payments correctly, but, in adding them up, made the totals 2*l.* greater than they were, and took credit for the larger amounts. These were the cases on which the indictment was founded. Evidence that, on a series of occasions before and afterwards, precisely similar errors had been made and advantage taken of by him, was received to show that the errors in the three instances to which the indictments related were intentional and fraudulent, and not accidental. *Com.* v. *Tuckerman*, 10 Gray 173, 200, was a charge of embezzlement. The court say,—"Where the intent of the accused party forms any part of the matter in issue, evidence may always be given of other acts not in issue, provided they tend to establish the intent imputed to him in committing the act." *Com.* v. *Shepherd*, 1 Allen 575, 581, was another case of embezzlement. It was held that evidence of another act of embezzlement by the defendant, during the same week, was competent on the question of intent. In *Com.* v. *Eastman*, 1 Cush. 189, 216, the defendants were indicted for obtaining goods of certain persons by false pretences. Evidence of the purchase of other goods from other persons was held competent on the question of criminal intent. *Reg.* v. *Roebuck*, Dearsly & Bell C. C. 24, was another case of false pretences. The false pretence was that a chain, pledged by the defendant to a pawnbroker, was silver. Evidence that the defendant a few days afterwards offered a similar chain to another pawnbroker was held admissible.

*Rex* v. *Winkworth*, 4 C. & P. 444, was a charge of robbery. The pros-

ecutor was induced by the defendants' advice to give money to a mob who came to his house, to get rid of them and prevent mischief. To show that the advice was fraudulent, and a mere mode of robbing the prosecutor, evidence was received to show that the same mob had demanded money at other houses when some of the defendants were present. *Defrese et al.* v. *The State,* 3 Heisk. 53, 62, was another indictment for robbery. Verdict, guilty of larceny of the prosecutor's watch, which was obtained by the defendant under the pretence of a bet. Evidence was held competent to show that the defendant had attempted to practice the same artifice on other persons and on other occasions. The court say (p. 63),—"As a general proposition of law, it is undoubtedly true that no distinct and substantive crime can be shown upon the trial. But this rule is better understood as it is given in the text-books, that the facts proven should be strictly relevant to the particular charge." Upon the question whether the purchase of property from one person was fraudulent, evidence is admissible to show that the purchaser fraudulently bought other property of other persons. *Bradley* v. *Obear,* 10 N. H. 477, 480 ; *Hovey* v. *Grant,* 52 N. H. 569. And the same rule admits evidence of one fraudulent transaction to show a fraudulent intent in another transaction, in criminal as well as in civil cases. *State* v. *Johnson,* 33 N. H. 441, 456, 457. *Reg.* v. *Bleasdale,* 2 C. & K. 765, was a charge of stealing coal. The defendant was lessee of a coal mine, and from the shaft of the leased mine he had wrongfully cut into the adjoining premises, and taken coal during a period of more than four years from the coal fields of thirty or forty different owners. All this was held competent on the question of felonious intent in taking the coal of one person.

In an admirable brief of Attorney-General Train's, of Mass., in *Com.* v. *McCarthy,* Essex, November, 1875 (to which I am much indebted, and which I send to the chief-justice), a few similar authorities are cited on evidence of guilty knowledge in receiving stolen goods, passing counterfeit coin, and uttering forged notes. The application of the rule in such cases is too common and familiar, and the authorities are too numerous, to justify counsel in dwelling at length on this branch of the subject. In *Rex* v. *Balls,* 1 Moody C. C. 470 (S. C. 7 C. & P. 429), on a trial for forging and uttering a note of the kingdom of Poland, on September 1, 1835, evidence was received to show that the defendant, on August 24, 1835, agreed to forge a thousand Austrian notes, and that in September, 1834, he had plates for printing Polish notes different from that which was the subject of the indictment, and caused five hundred notes to be printed from those plates. The case was reserved, and the judges held the evidence was admissible. Such evidence is competent, whether the possession or utterance be prior or subsequent, and whether the false documents, notes, or money, be of the same or a different description. *Reg.* v. *Foster,* Dearsly C. C. 456 ; *Reg.* v. *Nisbett,* 6 Cox C. C. 320 ; *Reg.* v. *Salt,* 3 F. & F. 834; *Com.* v. *Price,* 10 Gray 472.

*Com.* v. *Edgerly,* 10 Allen 134, 186, 187, was a charge of having a

STATE v. LAPAGE. 259

counterfeit bank bill with intent to pass it. It was held that evidence was admissible to show that the defendant had and passed a different kind of counterfeit money at various times and places; and that he had made to a witness statements which amounted to an admission that he was a dealer in counterfeit money. " It cannot be doubted," say the court, " that a direct statement by the defendant, made previous to the transaction which forms the subject of the indictment, that he was accustomed to buy and sell counterfeit money," would be admissible. The fact of his being a professional counterfeiter, or a common dealer in counterfeit money, was relevant to the particular charge of knowingly having a counterfeit bill with intent to pass it; and being relevant, it could be proved by other evidence as well as by his own statements.

On a trial for burglary, it is no valid objection to evidence, tending to show the burglarious intent of the defendant's act, that it proves another and distinct offence; but the intent with which he entered may be shown by proof of a felony committed in an adjoining store. Osborne v. People, 2 Parker C. R. 583 ; Phillips v. People, 57 Barb. 353. In Mason v. The State, 42 Ala. 532, 539, evidence was held admissible to show that the prisoners had committed other burglaries than that charged. The court say,—" The evidence tended to show that there was a privity and community of design between the prisoners to commit offences of the character charged against them." " Privity and community of design " is a larger phrase than " intent," but it means the same thing. To show their intent, written articles of agreement, signed by the defendants, setting forth their intent of going into the burglary business, would be competent. And it would not be necessary that their agreement be reduced to writing. Their oral statements would be equally competent, as in the case of the dealer in counterfeit money. And the intent may be proved by other burglaries, as well as by written or oral statements ; by acts, as well as by words written or spoken ; by the executed, as well as by the executory agreement. And in the case of a single defendant, his intent may be shown by the same kind of evidence that would be admissible against several joint defendants, as in the case of the dealer in counterfeit money. Evidence that a man has often passed counterfeit money has a legal tendency to show that he intends to pass more of the same kind of money found in his possession. The number of his previous attempts to pass such money affects the weight, not the competency, of this kind of evidence. So, when A has broken and entered B's house, and the question is whether he broke and entered it with a burglarious intent, evidence of his having repeatedly broken and entered other houses for the purpose of stealing tends to show the intent with which he broke and entered B's house.

In Com. v. Turner & Shearer, 3 Met. 19, 24, 25, this general rule of evidence was applied to a case of kidnapping. The indictment was for kidnapping a negro boy, Sidney, with intent to send him out of the state. There was evidence tending to prove that the defendants got

Sidney into their possession in Worcester, by the false representations
of both the defendants to his father that Shearer resided in Palmer
and kept a store there, and that Sidney was wanted by Shearer to
assist him in that store. Sidney was sent to Virginia. Evidence was
received to show that, the day before they got Sidney, Turner endeav-
ored to get another negro boy from the almshouse in Shirley, upon a
representation that the boy was wanted by Turner's father to live with
him in Palmer. This evidence was held competent. The court say,—
" Evidence of other facts than those connected immediately with the
act are always admissible, when the *intent* of the defendant forms a
material part of the issue, and when those facts can be supposed to
have any proper tendency to establish that intent. Upon recurring to
the indictment and the proceedings had thereon upon the trial, it will
be seen that the intent with which the defendant did the act complained
of became material, and was, in fact, a question directly submitted to the
jury to pass upon. The intent and purpose of the defendant in obtain-
ing the possession and custody of the individual alleged to be unlaw-
fully taken, were to be inferred from a great variety of circumstances,
and necessarily opened a wide door for the introduction of evidence of
the acts of the party accused, having any reasonable degree of con-
nection with the particular act complained of. It was with the view
of fixing the character of this last act that evidence was received
of the conduct and declarations of the defendant on the day previous
and at another place, and in reference to another individual about
whom overtures were made with a view of obtaining possession of his
person. With reference to such a purpose, and thus limited, it seems
to us to have been properly admitted." On a charge of keeping liquor
for sale, evidence that the defendant had previously sold other liquor,
or kept other liquor for sale, or was a liquor dealer, is admissible on
the question of intent. *State* v. *Plunkett*, 64 Me. 534; *Com.* v. *Stoehr*,
109 Mass. 365; *Com.* v. *Dearborn*, 109 Mass. 368.

A person's character for chastity, when it is relevant, is not shielded
from inquiry. It is a disagreeable subject of investigation ; but the
law makes no discrimination between subjects that are agreeable and
those that are disagreeable. *Wood* v. *Gale*, 10 N. H. 247. Sexual
crimes are not excepted, as a peculiar class, from the operation of the
general rule that admits relevant evidence. On an indictment for
adultery, evidence of previous improper familiarities is competent.
*State* v. *Wallace*, 9 N. H. 515; *State* v. *Marvin*, 35 N. H. 22; *Com.* v.
*Merriam*, 14 Pick. 518; *Com.* v. *Lahey*, 14 Gray 91. In *Com.* v. *Hor-
ton*, 2 Gray 354, and *Com.* v. *Thrasher*, 11 Gray 450, it was held that
although improper familiarities were competent, proof of actual adul-
tery (other than that charged) committed by the same parties with
each other was incompetent ; but in *Thayer* v. *Thayer*, 101 Mass. 111,
113, 114, the absurdity of that distinction was acknowledged, and the
two cases which established it were overruled. The court say,—"When
adulterous disposition is shown to exist between the parties at the time
of the alleged act, then mere opportunity, with comparatively slight

circumstances showing guilt, will be sufficient to justify the inference that criminal intercourse has actually taken place. The intent and disposition of the parties towards each other must give character to their relations, and can only be ascertained, as all moral qualities are, from the acts and declarations of the parties. It is true that the fact to be proved is the existence of a criminal disposition at the time of the act charged; but the indications by which it is proved may extend and ordinarily do extend over a period of time both anterior and subsequent to it. The rules which govern human conduct, and which are known to common observation and experience, are to be applied in these cases as in all other investigations of fact.     *     *     *     * By the application of the rule laid down in these cases *( Com.* v. *Horton* and *Com.* v. *Thrasher)*, evidence tending to establish an independent crime is to be rejected, although all acts which are only acts of improper familiarity are to be admitted in proof. There is no sound distinction to be thus drawn. There is no difference between acts of familiarity and actual adultery committed, when offered for the purpose indicated, except in the additional weight and significance of the latter fact. The concurrent adulterous disposition of the defendant and the *particeps criminis* cannot be shown by stronger evidence than the criminal act itself."

A " concurrent adulterous disposition " in both parties is not necessary to be proved in a case of rape. *Williams* v. *The State,* 8 Humph. 585, was an indictment for an assault with intent to commit a rape upon the defendant's daughter. Evidence was received showing his previous attempts to have sexual intercourse with her. And this was held competent to show the intent with which the assault charged in the indictment was committed. The same doctrine prevails in this state. Even Judge BELLOWS, who is understood to have entertained extreme opinions adverse to collateral issues, was not aware of any reason that would justify the court in departing from the principle of our own decisions. *State* v. *Knapp,* 45 N. H. 148, 156, 157.

Suppose the defendant were tried for breaking and entering the store at the north end of Elm street in Manchester—the most northern of all the stores on that street—with intent to steal: suppose it were proved that he broke and entered that store ; that he was arrested as soon as he entered it, and the only question were whether he intended to steal: suppose there were one hundred other stores on that street, and he had broken and entered every one of them, and stolen something in every one of them, beginning at the south end of the street and taking the stores in succession, on his burglarious march from one end of the street to the other : suppose he did all this in one night, and was completing his night's work when arrested : on the question of his intent in entering the one hundred and first store, would anybody think of objecting to evidence of his one hundred larcenies in the other one hundred stores? His robbing one hundred stores would tend to show that he intended to rob the one hundred and first, just as his passing counterfeit money in the one hundred would tend to show

that he intended to pass counterfeit money found in his possession in the one hundred and first. There would be no difference between his presence in the one hundred and first store, and his having counterfeit money in his pocket in that store, that would, on the question of intent, affect the admissibility of the evidence of what he had done in the other hundred stores. Suppose, instead of robbing stores, he had robbed persons, going from one end of the street to the other, and knocking down and robbing one hundred men, one after the other, and not touching a single woman : suppose, when he had knocked down the one hundred and first man, and before he had had time to rob him, he had been arrested, and the question were whether he intended to rob him,—whether his last offence were an attempt to rob, or a mere assault, or an assault with intent to kill : would anybody suppose his robbing the other hundred men, after he knocked them down, was no evidence of the intent with which he knocked down No. 101 ? Suppose the one hundred and one persons whom he assaulted were women : suppose he touched no man : suppose he had unsuccessfully attempted to ravish one hundred of them, and were arrested at the instant of his knocking down the one hundred and first, and the question were whether his last assault were a mere assault, or an assault with intent to commit a robbery, or an assault with intent to commit a rape : suppose the last woman assaulted should die of her injuries, and the defendant were indicted for her murder : and suppose it were necessary (as some judges in this state, as well as elsewhere, have thought it to be—*State* v. *Pike*, 49 N. H. 399, 404, 405, 406) to allege in the indictment the offence which the defendant was attempting to commit when he struck the blow that unexpectedly proved to be fatal : would Your Honors, if it were your duty to draw the indictment, think it necessary to allege any other attempt than an attempt to commit a rape ? Would you think it necessary to allege an attempt to commit a robbery ? And how would you expect, if you were the prosecuting officers, to find any better evidence of the defendant's intent than his attempts upon the other one hundred women ? It was as necessary for the state to prove the defendant's intent to commit a rape in this case as if it had been necessary to allege such intent in the indictment.

If the defendant were indicted for kidnapping or attempting to kidnap a negro boy (before the adoption of the 13th amendment), would anybody think it doubtful whether, on the question of intent, other attempts of the defendant to get other negro boys into his possession for a slaveholding purpose would be competent evidence ? And, when the intent is the thing to be proved, what difference is there that affects the admissibility of evidence of other similar acts, whether the defendant gets a negro boy into his possession with intent to send him into slavery, or whether he gets a girl into his possession, or makes an assault upon her with intent to commit a rape ? The proved intent with which he takes possession of the person of one boy or one girl tends to show the intent with which he takes possession of the person of another boy or another girl. In *Com.* v. *Turner*, evidence that the

defendant attempted to get possession of a negro boy in Shirley, under false pretences, tended to show his intent to send that boy into slavery; and evidence of that intent in that case tended to show a similar intent in the other case in which he was indicted. It was precisely as if he had sent one hundred boys from Massachusetts into slavery. The number of instances would affect the weight of the evidence, but not its admissibility. His sending one or more into slavery from Shirley, or getting possession or attempting to get possession of one or more in Shirley for that purpose, would be evidence of the purpose for which he got possession of Sidney in Worcester, just as his passing counterfeit money on one occasion would be evidence of his intent to pass other counterfeit money found in his possession on another occasion. What legal distinction is there between proof of the intent with which the boy Sidney was captured in Worcester, and proof of the intent with which Josie Langmaid was captured in Pembroke ? Why should sexual crimes, aggravated to the pitch of butchery, be so highly favored by the law as to be licensed and exempted from punishment by a special and peculiar dispensation suspending a general rule of evidence ?

The exclusion of evidence on account of its remoteness in point of time or place is the exercise of the discretionary power of the court, passing upon the question as one of fact and not of law. *Palmer* v. *Concord*, 48 N. H. 211, 219; *Darling* v. *Westmoreland*, 52 N. H. 401, 408, 410, 411, and authorities there cited ; *Haines* v. *R. T. I. Co.*, 52 N. H. 467 ; *Hovey* v. *Grant*, 52 N. H. 569. If too remote in point of time, evidence of other adulteries will be rejected, in the discretion of the judge who tries the case. *Thayer* v. *Thayer*, 101 Mass. 111, 114. " The more detached, in point of time, the previous utterings [of forged bank notes] are, the less relation they will bear to that stated in the indictment.        *        *        *        It would not make the evidence inadmissible." *Rex* v. *Wylie*, 1 New Rep. 92, 94—S. C. 2 Leach C. C. 973, 985. " In the trial of that case [*State* v. *Knapp*], the judge, in the exercise of what is called judicial discretion, allowed the parties to go back fifteen years ; and if he had allowed them to go back sixteen years, or only fourteen, no question of law would have arisen as to the proper length of time." *Darling* v. *Westmoreland*, 52 N. H. 410.

On page 412 of that case, the court refer to *State* v. *Wentworth*, 37 N. H. 196, 211, where it is held that the commission by the defendant of other crimes like the one charged is admissible to show that he had the strength and ability to commit the crime alleged in the indictment ; and the whole drift of every page of the opinion in *Darling* v. *Westmoreland* is distinctly in favor of that principle. But, in the course of a lengthy discussion of the distinction between relevancy as a question of law, and temporal or local remoteness as a question of fact, it is said that in *State* v. *Knapp*, on the question of the defendant's strength, evidence of his having committed upon various persons the crime of which he was accused would not be offered, because it is understood to be incompetent. This remark, made in connection with a hearty ap-

proval of the doctrine of *State* v. *Knapp* and *State* v. *Wentworth*, seems either to give the erroneous impression that sexual crimes may not be subject to the general rules of evidence, or to suggest that the court, in its discretion, can exclude evidence of other rapes tending to show strength, on the ground that other evidence of strength must be available, and that proof of other rapes would not ordinarily be offered in good faith on the mere question of strength.

All the evidence objected to in this case, except that of Julienne Rousse, was competent, not only on the question of intent, but also upon the question whether the defendant killed the deceased.

Josie Langmaid was killed October 4, 1875, about nine o'clock in the morning, on the Academy road, on her way to school. On the first day of October, about half past eight o'clock in the morning, about the time the girls would be on their way to the academy, the Cochran boy saw a man jump into the bushes, on the side of the Academy road, springing as if in haste, within a short distance of the place of death. On the twenty-fourth of September, at Fowler's house, the defendant, seeing Fowler's sister come home and go into the house, asked Fowler who she was. Fowler told him. The defendant then wanted to know if she had been to Suncook. Fowler told him no; she had been to school. The defendant then wanted to know which way she went to get there. Fowler told him, and pointed out toward the academy to show the direction; and the defendant said that that must be the way he came when he came out to Kimball's. On September twenty-fifth Fowler carried the defendant home, down Buck street, as far as Locke's; and at Russ's corner the defendant wanted to know if there was where his (Fowler's) sister went to school. Fowler told him no, and pointed out toward the academy again, and told him two miles, or a mile and a half, or a mile, "and then turn to your right and go up." Sunday, September twenty-sixth, Fowler carried his sister back, went to Suncook, and brought the defendant out. As they went past the Academy road, Fowler told the defendant that that was the road on which his sister went to school. About a week before the fourth of October, when the defendant was threshing grain in Fowler's barn, a young lady passed by. The defendant asked Mahair where that gal was going. Mahair said he didn't know. The defendant asked what her name was. Mahair told him her name was Sarah Prentice. The defendant wanted to know where she lived. Mahair told him, going to the door and showing him as near as he could. The defendant wanted to know who was going with her. Mahair said he didn't know. The next day, as Mahair was going through the barn, the defendant stopped him, and asked where that gal went that went down by. Mahair said he didn't know. The defendant wanted to know who went with her. Mahair said he didn't know. The defendant again asked who she was and where she lived; and Mahair showed him where she lived. Again the defendant asked who went with her, and said he wondered which road she went on the most, and made an obscene and vulgar remark and inquiry concerning

her. On the second of October, about nine o'clock in the morning, about the time the girls would be on their way to the academy, Towle and his wife met the defendant on the Academy road, about fifty or sixty rods from the place of death. The defendant was carrying a stick behind him, similar in all respects to a stick afterwards found, broken and stained with blood, near the place of death. On the last Sunday of September, Anna Watson, on her weekly return from her home in Allenstown to her school in Hooksett, was pursued by the defendant a considerable distance, and until he came in sight of Mack or Mercy, when he suddenly disappeared in the woods. He carried a club, and his face was red and excited. He ran after her more than half a mile.

All this evidence tends to show that the defendant killed Josie Langmaid. It shows that the neighborhood of the place of death was his hunting-ground, and it shows the object and intent of his habitual hunt. Change all this evidence only so far as to substitute partridges for women,—and suppose the question were, whether this defendant killed a partridge, found cut in pieces where the remains of Josie Langmaid were scattered : if his talk with Fowler, relating to Fowler's sister, had related to partridges; if he had inquired, not which way she was accustomed to go to school, but where partridges were plenty ; if Fowler had twice told him they abounded on the Academy road, and pointed out the place ; if his remarks and inquiries addressed to Mahair had not related to Sarah Prentice and the road she went on the most, and had not been obscene and vulgar, but had been such as to show he was meditating a partridge-hunt; if his interrupted chase of Anna Watson had been an interrupted attempt to kill partridges,— would any one object to all this evidence on the ground that it did not show a special intent to kill the particular partridge that was found dead ? If a man had been robbed at the place of death, would all this evidence, so far altered as to relate to men accustomed to carry large amounts of money, be excluded, because the man who was robbed was not one of those concerning whose route the defendant had previously inquired, or whom he had previously pursued ? How would the competency of such evidence be affected by the circumstance that, by some accident, the travellers concerning whom the defendant inquired happened to escape, and that another happened to be the victim ?—or by the circumstance that in one instance the robbing intent was exhibited by a pursuit more significant than such an inquiry about a person's route as tends to show a design to waylay or pursue him ? The gist of such evidence is not merely in showing an intent to rob the particular travellers, who providentially escaped, but in showing an intent to rob any one who would be likely to have what the defendant wanted. Are professional highwaymen to be acquitted by the exclusion of previous intentions, preparations, and attempts, because such evidence relates to anybody they may meet, and not to the particular victim named in the indictment ? Is the region round about every girls' school in the land to be infested, as the neighborhood of this acad-

emy was, by a professional hunter of women, a fugitive from justice, flying from a foreign country to this for the safe continuance of his business? And are such men to be encouraged by being excepted from the rules of evidence that apply to forgers and counterfeiters? Are our daughters to be exposed to human beasts of prey, incited to their diabolical work by an exemption from the operation of those general principles by which even our miserable currency is protected?

The testimony of the Cochran boy tends to show that about schooltime some man was prowling about the Academy road, who was unwilling to be seen and recognized by that boy. It tends to show that Josie Langmaid's death was not accidental. Why was that boy allowed to pass unharmed? His sex saved him. Is not that fair matter of inference and argument? The defendant hunted neither men, nor boys, nor old women. The fact that Fowler's sister was accustomed to go to the academy, over the Academy road, was a subject that interested him on September 24, 25, and 26. On October 2, about the time the girls would be going to school, he walked on that road carrying a stick, similar in all respects to the one found two days afterwards, broken and stained with blood, near the place of death. His talk with Fowler about Fowler's sister, his talk with Mahair about Sarah Prentice, and his pursuit of Anna Watson, tend to show that Josie Langmaid's death was not accidental; that she fell a victim to the purpose for which the defendant hunted in that region,—the purpose for which he so eagerly and repeatedly inquired about the usual routes of Fowler's sister and Sarah Prentice,—the purpose for which he so hotly pursued Anna Watson. If he hunted beasts of the field or fowls of the air in that neighborhood, that fact would be evidence on the question whether a beast or bird (of the class which he hunted), found killed in that neighborhood, was killed by him. If he went forth to rob any one he might meet, that fact would be evidence on a question of robbery.

The testimony of Cochran, Fowler, Mahair, Towle and wife, Mrs. Watson and daughter, and Mercy, tends to show that the defendant roamed about that district for some purpose; that his purpose was not to pick berries, as Mack did, not to rob any one of money, not to escort the feebler sex through woods and bushes, and protect them against the peculiar insults and outrages to which that sex is exposed in solitary places, not to revive the spirit and practice of chivalry for the defence of women, but to practice upon them the reviving ferocity of a barbaric age. And Josie Langmaid was found killed and mutilated in a manner corresponding to the purpose for which he ranged that part of the country.

All the evidence which I have thus far considered tends to show that the defendant killed the deceased, and also the intent with which he killed her.

II. The jury having found, on other evidence than that of Julienne Rousse, that the defendant committed the homicide, her testimony was competent to show the intent with which he committed it. Her testi-

mony was, that he committed a rape upon her, at St. Beatrice in Canada, four years and four months before the homicide. It was necessary for the state to prove the defendant's intent to commit a rape on the deceased. If he killed her without premeditation, in a struggle consequent upon his insulting her, or committing an indecent assault upon her, without any raping intent, there was no ground on which he could be found guilty of the first degree of murder. And all the other evidence might be explained on a hypothesis of that kind, consistent with his innocence of that degree of murder. Whether such an explanation would raise a reasonable doubt in the mind of any juror, who can tell? It was the duty of the state to leave no room for doubt. And on the question whether his intent was to commit an indecent assault, or to commit a rape, what better evidence could be had than his intent on other similar occasions when he was not interrupted and defeated, as he was in his pursuit of Anna Watson? If a man's intent to pass counterfeit money at one time is evidence of his intent to pass other counterfeit money found in his possession at another time; if his intent to sell liquor at one time is evidence of his intent to sell other liquor at another time; if his intent to send one negro boy into slavery is evidence of his intent to make the same disposition of another found in his possession,—why is not his intent to commit a rape upon Julienne Rousse, when he took possession of her, evidence of his intent to make the same disposition of Josie Langmaid, when he took possession of her? Manifestly the only objection to this evidence is the remoteness of the rape in point of time and place. It is settled by the authorities which I have cited, that that objection raises a question of fact within the discretion of the court, and not a question of law. The question of discretion is reserved. Should the judgment be reversed, and a new trial granted, on the ground that, as a matter of fact, the rape to which Julienne Rousse testified was temporally or locally too remote to be entitled to any weight on the question whether the intent with which the defendant assaulted the deceased was the same as that with which he assaulted Julienne Rousse?

If he had passed counterfeit money at the time and place when and where he raped Julienne Rousse, and other counterfeit money had been found in his possession at the time and place when and where he killed Josie Langmaid; if he had sold liquor at the former time and place, and other liquor had been found in his possession at the latter time and place; if he had got a negro boy into his possession at the former time and place with intent to send him into slavery, and had got another negro boy into his possession at the latter time and place,— would there be any doubt that his intent on the former occasion would in fact be considered, by every intelligent member of the human family, as entitled to some weight on the question of his intent on the latter occasion? If a ship-master lands in Congo, obtains a cargo of blacks, and carries them to Cuba, and four years and four months afterwards he is found at another place on the African coast, as far from Congo as Pembroke academy is from St. Beatrice, with a hundred blacks in his possession,—

would anybody think that his proved intent on the former occasion had, as a matter of fact, no tendency to show what he intended to do on the latter occasion? What want of analogy is there between making prisoners of blacks at such different times and places, and making prisoners of these two young women? What is there in the color of the captives in the former case that can carry more significance, from the proved intent of their captor in one abduction to the question of his intent in another, than is carried in this case by their age and sex? or carry the significance across a greater interval of time or place? What is there in the act, the circumstances, or the intent of kidnapping, or passing counterfeit money, or selling liquor, that makes us feel the probative force of the proved intent of one occasion upon the question of intent four years and four months afterwards, and prevents our feeling any probative force of such evidence in the present case? There is no distinction that can exempt sexual cases from the effect of the operation of such evidence upon the human mind, or shorten in those cases the temporal or local distance reached by such evidence in other cases. That is plainly true, as a matter of fact; and it is a mere matter of fact that we are considering.

The distance of place is immaterial. The defendant could have gone in a few hours from the place where he clutched Julienne Rousse, to the place where he pounced upon Josie Langmaid. There was nothing in either of the places peculiarly calculated to create or destroy an intent to pass counterfeit money or to commit a sexual crime. The distance of time is the only possible ground of objection.

On this point I must appeal to the court as I would appeal to a jury, because the question is one not of law, but of fact. If your honors were the sole tribunal, trying the defendant upon this indictment, and sworn to decide upon grounds of natural law, natural reason, and human experience, upon such evidence as on those grounds seemed capable of affording any light, would you receive the testimony of Julienne Rousse? I do not hesitate to assert that you would receive it, and weigh it. No man on earth would refuse to hear it, or to consider it, unless he were bound by some arbitrary and irrational rule overriding his understanding, and dictating a course at war with his commonsense. Your honors would give it some weight, because you would infallibly know, from the teaching of history and universal experience, your knowledge of human nature, and the authority of an intuition superior to all artificial reasoning, that the evidence of the intent with which the defendant seized Julienne Rousse has some tendency to show the intent with which he seized Josie Langmaid, notwithstanding the two seizures were separated by the distance of four years and four months. Whether the weight of the evidence is diminished by that lapse of time, and if so how much, are questions that do not arise here. But the question whether your honors, in the supposed trial, would receive the evidence and give it some weight, is the very question to be decided in this case,—for it is settled that whether evidence should be excluded for temporal or local remoteness is a question of fact, and

not a question of law ; and the question of fact here is, whether, on those grounds of natural law, natural reason, and human experience, upon which such a question of fact must be decided, the intent with which the defendant assaulted Julienne Rousse is capable of affording any light on the intent with which he assaulted the deceased.

For error in a ruling on a question of law, the court might feel bound by precedent to grant a new trial, although satisfied that no injustice had been done. But on this question of discretion, in which not law, but justice alone is concerned, will the court reverse the judgment of the circuit court, without any cause to believe that the defendant has suffered actual wrong ?

It will be admitted, I suppose, that every intelligent person, untrammelled by technical rules, will concur in the opinion of the circuit court. And the question being one of pure fact unmixed with law, and therefore not subject to technical rules, on what ground will any one dissent from the unanimous judgment of the rest of mankind ? If that unanimous judgment were a conclusion of metaphysical subtlety, or scholastic sophistry, or a blind faith, based on an evident obliquity of mental or moral vision, a misunderstanding of natural phenomena, ignorance of the laws of the material or spiritual universe, or a tradition or superstition that had survived the low civilization of its origin, it might be a feeble authority. But it is the spontaneous and irreversible judgment of every grade of intellect that has appeared, or is likely to appear, in this state of existence. It is an involuntary and unavoidable perception of the inherent and self-evident relations of conduct and intention ; a mental revelation as natural as memory, and as trustworthy and unanswerable as consciousness. Why should any one be particularly anxious, in this case, to introduce not a legal principle, but a dogma of fact, refuted by the instinctive knowledge of the whole human race ? If, in the administration of justice, the experiment is to be tried of deciding such questions of fact as this in defiance of the innate and universal logic of rational creatures, it certainly is not necessary that this class of cases should be selected for the attempt. In asking that the experiment may not be first tried in a case of this kind, I utter the fervent remonstrance and prayer of every father and mother who has a daughter, at school or at home, exposed to the fate of Georgie Lovering and Josie Langmaid.*

*W. T.. Norris* (with whom were *S. B. Page* and *H. W. Greene*), for the respondent.

---

* In the trial of Mr. Hawkins, a clergyman. for stealing money and a ring from Henry Larimore in September, 1668, Lord HALE admitted evidence to show he had once stolen a pair of boots from a man called Chilton, and that, more than a year before, he had picked the pockets of one Noble. In summing up, Lord HALE said, after referring to the cases of Chilton and Noble,—" This, if true, would render the prisoner now at the bar obnoxious to any jury." 6 Howell's State Trials 935." (This was 208 years ago.)

In urging our bill of exceptions, what of it relates to the testimony of Julienne Rousse will first be considered.

Commenting on the use the jury might make of it, the court gave them this instruction : " It is a fundamental principle of law, that evidence that the defendant committed one offence cannot be received to prove that he committed another and distinct offence." Here is a familiar principle well enough stated. It is indeed fundamental—old as the common law, and wise as common-sense.

No claim is made by us to exclude her testimony from use, under the direction of the court, because it proves another offence, but because it proves a distinct offence. Put the word transaction in the place of the word offence, and we encounter the same objection. It all rests on the ground of distinction. Want of connection—the crime disclosed with the crime charged—is the reason of the exclusion. It has no other foundation.

Crime is made up of act and intent combined. Without the evil intent, or what amounts to it in law, there is no guilt. Without the overt act there is no sin, in the eye of human tribunals. And it seems to be agreed on all hands that such evidence as hers is not competent in proof of the act of murder. Up to this point there is no controversy. " Only upon the question of intention, and thus upon the degree of guilt," does the court below attempt to make it competent.

No exception was taken to the charge, because the use the jury was instructed to put the evidence to, after it was in, was perhaps as well for our client as any charge could have directed. Our objection went to its admission. It went in subject to our objection. As it went in, the jury were free to use it on any question before them. If only two questions were in issue, they could use it on either. But the court tells them they must use it on but one of the two. How could we object to that ? What is the exception to that charge ? After deferring unduly, as we believe the court did, and against our exception, to what the external exigencies of the cause were clamorously demanding, what right had we then to object to a partial correction of the error and prevention of the injury ? Why talk about " an unexceptionable charge " ? We could not object to what was charged in our favor. Our wish was, that nothing be charged as to how this evidence might be used. Our objection to its admission would then have its full force. If the charge had been that it be not used at all, we had to that charge no valid objection. But the jury would have had the evidence, and we might have lost our objection to its admission. What the court did say in the charge we could not object to, and still, the more it did not say, the better for the objection already taken. We were in a strait, with the less said the better. But do not call it " unexceptionable." " Take any shape but that," my adroit friend. Our firm nerves tremble, and our cheeks blanch, before even a shade of a ghost of a right slaughtered or lost by our negligence. Do not try to save your verdict by making a " corner " on us for not excepting to the charge. What then is " the only question of law raised by the bill of exceptions " ? Not, we sub-

mit, " whether the evidence objected to is admissible for any purpose. No claim is made that the evidence we are now considering has any legal tendency to show that the defendant killed the deceased." Has it any legal tendency to show " that he intended to commit a rape upon her " ? Is the intent to commit a rape upon her in question ? It is the act, either of attempt or perpetration of that crime, resulting in murder, that must be shown. No matter about any express intention. One may be implied if the act be proved. Our objection to the evidence raised the question whether it was inadmissible for any reason. It may be competent on one ground, but incompetent on another ground. Under our general exception, we take it we have the benefit of this distinction. How much of it is taken away from us by the special charging of the court ? Pray, give us all there is left. And, even then, do not hang our client because the court below erred in not assigning him counsel a match for all the regular and special counsel for the state, aided by a whole train of them from over the border.

Actual proof of intention is not always needed. Malice, the essence of all crime, may be express or implied. *Brown* v. *Commonwealth*, 76 Penn. 319.

It is not indispensable to a conviction that a motive be proved. *People* v. *Robinson*, 1 Parker C. R. 644.

Murder by a free moral agent, when no motive or provocation is shown, we take it, must be of the first degree. Under the laws of causation, claimed to be universal, sane men act from motives. Madness may have method in it ; but with a sound mind and well proved act as given data, all needed motive is presumed. And in the case at bar, no real intention to murder need be either proved or implied. It is enough if a rape was attempted or perpetrated, and the murder followed. Take away the rape and the attempt of it, and fix the act of killing upon the respondent, and then his crime, without other proof of intent, takes the utmost degree of enormity. " Sex, age, and mutilalation " may not alone bridge over " the wide gulf between " murder and death from accident, disease, or suicide, or the thousand and one mere figments of the brain that may be conjured up to hold open the door the circuit court ought to have kept shut and securely barred. But the point we make here is, that no actual proof of express malice of any kind was made essential, by any phase of allegation or answer either in pleadings or proofs the case presented.

Under our statute defining the degrees of murder, arson, rape, robbery, and burglary, in conditions there given, are merged in the greater crime, as much as poisoning, starving, or torturing. Hence, none of these acts thus ending in murder can be the motive of the murder. No act or thing, nor any part of it, can be the cause of its own being. Instead of motives, then, these acts or attempts are mere methods or occasions of the murder. Hence, evidence tending to prove the act of rape tends by the same token to prove the act of murder ; and if it is to be excluded because it tends to prove the act of murder, by the same rule it must be excluded from proving the act of rape.

Premeditation of crime, or the means to do it with, may precede the bare act of it a long time. Hence, evidence of them may seem to take a wide range in both time and space. Buying poison may be shown, or stealing it, no doubt, with burglary and arson, perhaps ; it may be a witness of a former crime, or a *particeps criminis* liable to turn state's evidence, who is put out of the way ; prior like attempts on the same person or thing, or like crimes on other persons, but standing in similar relations and giving rise to the same motives ; sexual crimes, or acts indicating a desire of change in marriage relations :—in all these cases, and many more found in the books, a prior crime may be disclosed ; but in all of them this disclosure is a mere incident, not, as in the case at bar, an element, or the burden of the evidence. And this we understand to be the true rule and spirit of all the authorities. It completely covers and disposes of all the murder cases cited on the other side : on a charge of shooting with intent to kill—proof, shooting at the same person at another time ; charge, murder of her husband by poison—proof, three of her sons being subsequently poisoned ; charge, murdering her children by poison—proof, two other children of hers, and a lodger in the house, had died of poison ; charge, murder of Garner's mother by poison—proof, the wife, also charged, had lived in his family as a servant when his first wife died, and that she died of poison ; charge, murdering her infant by suffocation in bed— proof, deaths of her other children at early ages; charge, murdering H.—proof, H. had been employed by the defendant to murder P.; charge, murdering the defendant's wife—proof, his adulterous intercourse with another woman ; charge, murder—proof, adulterous intercourse between the defendant and the wife of the deceased ;—not a single one of them in violation of the rule laid down in *Shaffner* v. *Commonwealth*, 72 Penn. 60. " To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish."

Take the authority quoted in the charge : " Whenever the evidence which tends to prove the other crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time he did the act complained of, it is admissible ;"—not merely by showing, as in this case, that the prisoner had a native propensity, by him held in common in kind with all other men, liable, in him and them, to be inordinately inflamed ; nor by merely showing him to be a bad man, because in him it had been so inflamed in a single instance by a single person, a member of his family, after years of familiarity and perhaps fascination, but by showing this particular bad intent or inflammation of passion to have actuated him at this time, and on this occasion.

Take our own case—*State* v. *Knapp*—cited on the other side. On one point we do not believe in its doctrine. It is not well considered. It has some aid from other cases, but it is not sound logic, it is not

good law, it is not common-sense, to infer, as it does, an act of such extreme criminality from incipient acts ordinarily having a much less criminal but more natural ending; but on proving strength to commit the crime alleged, it is sound as a rock. Physical strength is a physical fact, to be proved like any other physical fact, when courts and juries are expected to use their own experience and observation of the natural course of things. Suppose, in the case, the ability of the defendant in another direction to commit the rape had been in issue—that he was a man or his victim a woman : evidence then, if needed, might have gone back to the time of their births without touching any question of discretion. My brother does not venture this case out on the first point, and on the last he entirely mistakes its meaning. Courts have no discretion in admitting or rejecting legal testimony. In middle life a man's strength may be well shown from exertions of it fifteen or twenty years back. It would not do to go so far back on those made by a boy of twenty, or an old man of seventy-five. In either case they would not be evidence. And this is about all there is of discretion on questions of evidence.

When the *scienter* or *quo animo* becomes an essential factor in the problem of guilt or innocence to be solved ; when proof of malice becomes indispensable to a conviction,—such evidence of other like acts may then be competent. Wharton's Crim. Laws 649. It is so when proof of the motive becomes peculiarly material on account of some peculiarity of the crime, or its dependence on some peculiar motive,— when the act is innocent, as a rule, and its criminality the exception. Under this head we can dispose of all the cases cited on the other side, or found in the books, of forgery, counterfeiting, uttering base paper or coin, embezzling, obtaining money and goods under false pretences, fraudulently conveying or pledging property, kidnapping boys, and other fraudulent transactions. In such cases the intent is always material to be proven. It can rarely, if ever, be inferred, because the act, or what constitutes that part of the crime, is just like what is innocently done by everybody in the every-day business of life. Notes and obligations are signed and negotiated, clerks and agents are trusted and entrusted, boys hired, with traffic in all its endless ramifications, running in debt, failing and running away, tight places, temptations, pride, pinching poverty, with money in all hands, hard and soft, going the rounds of circulation, begetting a love of it, the root of all evil, and giving occasion or motive for a great number of offences, both *malum in se et malum prohibitum,* known to modern civilization and law, where intention of wrong-doing is often almost the only index and exponent of the criminality. In these cases, the mind the thing is done with is the question of questions; and, mind you, the act is proved, or not questioned. Hence, it stands to reason that the intent or knowledge this act—innocent or indifferent in itself, it may be—is done with may well be learned from other acts of the same kind, done under the direction of the same mind. Perhaps the rule is best put in the words of Lord MANSFIELD : "When an act, in itself indifferent, be-

comes criminal if done with a particular intent, then the intent must be proved and found ; but when the act is in itself unlawful, the proof of justification or excuse lies on the defendant,—and in case of failure thereof the law implies a criminal intent."

In a murder case, cited in a note in Roscoe's Crim. Ev., page 92, as Heath's case, 1 Harnson 507, evidence was held competent to prove that the accused, on the same day the deceased was killed, and shortly before the killing, shot a third person,—though it proved a distinct felony, as it appeared to be connected with the crime charged as a part of the same transaction. Not being able to see the full reported case, its doctrine as digested is not verified. Obviously the term " distinct" is not used in the sense of disconnected, any further than to mark two distinct felonies. It has no reference to a separation of the acts constituting the crimes; they were connected as parts of one transaction. Hence the case comes within the rule, that to be competent, one crime to prove the other, they must be connected. With a slight expansion, and perhaps without, this case seems well enough to cover the chain of facts so closely connected together in Elm street and in my brother's fertile brain, extending from one end of it to the other—meaning the street, of course—taken " in succession," and " all in one night." *Regina* v. *Cobben,* 3 F. & F. 833, is exactly in point, where, on a trial for breaking into a booking office of a railway station, evidence was admitted that the prisoner had, on the same night, broken into three other booking offices of other stations, " on the ground of the four cases being all mixed up together."

It is hardly worth while for me to review any more cases cited by counsel for prosecution. Our case is murder. On trial, it is proposed to show a murder committed in perpetrating or attempting to perpetrate rape. Evidence in proof of that charge was offered, tending to show that four years and more before, the defendant committed rape without murder on another person in a distant country. We objected. Objection overruled. Evidence admitted. Jury instructed to use it in finding intention only, and thus finding degree of crime. No claim is made that the evidence helps to find intent, only in so far forth as it helps to find a bent of mind or inclination to commit that kind of crimes. We say no such help is legal, whether claimed as a question of logic, law, or discretion. No case has been cited looking our objections squarely in the face. And if the rule of evidence, sought for by the prosecution, cannot be found in capital cases, this court will not seek far for guides in this case in paths taken in tracing out men's ways that are dark, in killing horses, hunting partridges, or putting money in the purse.

It is not competent to show that one has a tendency *to commit* crimes like the one he is charged with. *State* v. *Renton,* 15 N. H. 169. It is not proper to raise a presumption of guilt on the ground that, having committed one crime, the depravity it exhibits makes it likely he would commit another.

*Shaffner* v. *Commonwealth,* 72 Penn. 60, is a modern case, in a strong

STATE *v.* LAPAGE. 275

court, well considered, and almost exactly in point. Case:—Shaffner indicted for murder of wife by poison ; wife died June, 1871 ; evidence to show death from poison ; main question, was it administered by husband ; evidence of improper intimacy with one Susan Sharlock; evidence of symptoms of wife's death ; evidence offered that a first wife, who died in September, 1869, and John Sharlock, Susan's husband, who died in February, 1871, both died at the defendant's house, with similar symptoms as last wife, and that all of them were under his care at the time they died. Evidence as to first wife, rejected ; as to John Sharlock, admitted ;—verdict, guilty ; motion for new trial overruled ; sentenced to be hung ; writ of error to supreme court ; new trial ordered, because of admission of this evidence. Here we have two cases, and others might be cited,—one, our own, and some time back, by as able a court as we ever had ; the other, of very recent date, by an able court, fully sustaining the whole ground of our exceptions now under consideration.

No well read lawyer need be told that the doctrine of these cases is the doctrine of all the best earlier authorities. Indeed, until quite recent times, it was so far removed from debatable ground as not to be questioned. We may differ about the reason of its existence. It may have owed its birth to a sacred care for human life, to a judicial protest against sanguinary legislation, or to a conviction that disposition of mind, even when use has bred a habit, is too frail a premise to draw inferences from, bearing on issues of life or death. Whatever its reason, nobody doubts it existed. And we ask the court to consider whether or not it may come under the provision of the constitution, that " all the laws which have usually been practised on in the courts of laws, shall remain and be in full force until altered and repealed by the legislature." How much rules of evidence may come within the scope of this provision, perhaps, has never been determined. We are not sure, but think the point worth considering. Interest in the result of a cause, as a bar to the person testifying, had to be or was let down by act of legislation.

No rule of law is better settled than that the " evidence shall be confined to the point in issue." My brother insists on it, but likes the terms " pertinent " and " relevant " better. We insist on it, and do not care about the terms. It makes no odds that we know of how many circumstantial facts are put in evidence. What the rule demands is, that they be each one circumstantial—*circum stans*—standing around, each one to be proved as a primary premise, not as an inference from which the conclusion or verdict is to be drawn. " Plucking the grass to know where sits the wind " may be sensible enough, but throwing up straws to tell which way it will blow four years hence, lacks wit as well as poetry. It is of the nature of water to run down hill—it has a strong tendency that way; but who would think of inferring hence alone that a given water had run down a given hill ? Making no point of remoteness in time or space, let us see how well this evidence will bear analyzing. Premise to be proved : he committed a rape, in no

way, except in kind, connected with this crime.   Inference : a general
disposition to commit this kind of offence.   Next premise : this general
disposition in him.   Inference : he committed this particular  offence.
" Presumptions of fact are in truth but mere arguments."   Hence, as
all the evidentiary aid one of these acts gets from the other is through
this presumption of general disposition, it is but mere argument.   No
mark, except the class mark of kind, have they in common.   And why
such proof has not been used is because the argument is too far-fetched
—" too thin "—an inference from a presumption ; a chain of reasoning
of two or three links, with ample hiding-places for abundant fallacies.
It may be tried " by the common test of the validity of arguments."
Some men who commit a single crime have, or thereby acquire, a ten-
dency to commit the same kind of crimes ;—if this man committed the
rape, he might therefore have or thereby acquire a tendency to com-
mit other rapes ; if he had or so acquired such a tendency, and if
another rape was committed within his reach, he might therefore be
more likely to be guilty ; if so more likely to be guilty of rape, and if
there was a murder committed in perpetrating or attempting to perpe-
trate rape, he might therefore be more likely to be guilty of this
rape, and hence of this murder ;—a sort of an *ex-parte* conviction of a
single rape, from which the jury are to find a general disposition to
that kind of crimes, in order to help them out in presuming the
commission of another rape as a motive or occasion of the murder.   We
can find nothing like it in the books : and much of the best ability in
the profession is all up in arms against this innovation.

As a question of logic, then, there is no evidentiary power in this
testimony, entitling it to use in a trial of this kind.   As a question of
law, we have already attempted to show that, if it has any such power,
it cannot be used here.   And now we say, if there be any question of
discretion about it, it ought not to be used.   On this point, the reasoning
of the court in *Shaffner* v. *Commonwealth*, already cited, suggests all
that need be said.   But we take no time on this point.   If the point of
law does not save us, we cannot, in the nature of the case, hope much from
that of discretion.   In fact, we do not believe much in questions of dis-
cretion when a man's life is at stake.   Hanging ought not to go by dis-
cretion.   It is our client's last chance for his life.   He is entitled to a
fair trial by " due process of law," even if " his complexion be perfect
gallows."   And due process of law does not go much on discretion.   All
the light the jury sees his case in ought to be pure legal testimony.   It
should all emanate from the elements and incidents of the tragedy.   It
may get toned or shaded in transmission, not unlike the rays of
sunlight by refraction, but, when it passes the bench to the panel, it
must be free from court coloring or discretion.

Murder will out.   Its witnesses, though dumb, will speak.   If need
be, the voice of murdered blood will cry out from the ground.   Each
new case has its peculiar horror.   Now and then " a devil, a born
devil," who " like the shark and tiger must have prey," will run a ter-
rible race in crime before detection.   But be sure his crimes will find him

out. Innocent men will sometimes be accused. Even " the most guilty criminal may be innocent of other offences charged against him, of which he might acquit himself if fairly tried." " He may be guilty of them, and still innocent of the one with which he stands charged." No one can tell how soon he may be the victim of seeming adverse circumstances. Such things have been, and may be again. And when they do come, a wise and firm administration of the law, in the face and eyes of popular indignation, is our only city of refuge.

Who knows the jury " found the homicide committed by the defendant, on other evidence than that " we have been considering ? Is it so said by a general verdict of guilty ? It is not so said by the case made by the court allowing the exceptions. My brother says it in his argument. And it is just here that our exceptions, as it seems to me, take on their most formidable proportions. Even my learned brother, after years of experience in the trial of criminal cases, gets confused and misled, or means to mislead, as to the use made of this testimony. It is said by the court, in *Shaffner* v. *Commonwealth,*—" Logically, the commission of an independent offence is not proof of itself of the commission of another crime. Yet it cannot be said to be without influence on the mind, for, certainly, if one be shown to be guilty of another crime equally henious, it will prompt a more ready belief that he might have committed the one with which he is charged ; it therefore predisposes the mind of the juror to believe the prisoner guilty." It tends to give undue prominence and force and weight to all the other evidence in the case for the prosecution. It detracts, in like manner, but in double portion, from all the evidence in his defence. It prejudices the jury against him, and inclines them to look with suspicion on all who come forward to testify in his favor. Hence, it is " not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burden a trial with multiplied issues, that tend to confuse and mislead the jury." And the problem for " human reason and human experience " to solve, in view of this " natural law," is, not what rule is desirable to be applied in a given case, but what one, on the whole, is wisest and best to be applied in all cases.

Who can say that " no injustice has been done " ? We have found that neither tendency to crime, evil disposition, nor bad character can enter the lists as circumstantial evidence. 1 Phillips Ev. (7th ed.) 181. Even admissions made of a similar crime, and of a tendency of mind that way, cannot be competent. 1 Chitty Crim. Law 504. Proof that the accused was influenced by a strong motive of interest to commit the offence charged, ought never to operate in proof of the *corpus delicti.* 1 Starkie Ev. 490. When tendency of mind is excluded, what vestige of the first crime is left, by which the defendant is to be traced to the last one ? Neither mental nor moral science has as yet been able to mark out a path by metes and bounds, nor even to blaze a trail, by which this border land of probabilities may safely be entered in legal criminal investigations.

In questions of character, it is held that mere proof of isolated facts can afford no presumption—1 Taylor's Ev., sec. 326; and if not of character, how of tendency of mind or disposition—a mere element of character? Crime is possible of everybody; it is probable of nobody. We might cite any amount of authority against inviting juries, much more sending them, out on voyages of conjecture and speculation. Investigating possibilities of crime is not their province; and this testimony touches on possibilities. "Seven hundred pounds, with possibilities, is good gifts." But proof of a single crime, years agone, with possibilities after, is bad evidence.

My brother says "this evidence was cumulative." What evidence he means we are not quite certain. If he means what we have been talking about as no evidence, then his notion of cumulating with it, or on it, is, in our estimation, like what somebody—Tom Hood, is it?—says about increasing, cumulating, a wife's salary: it was nothing before, and so it was doubled. If it has no legal status in court, it can neither cumulate nor be cumulated. Here there can be no distinction between its relevancy as a question of law, and its temporal or local connection as a question of discretion.

Nor is the question of good faith in putting it in in question. We say it was put in by the counsel for the prosecution without any indication to the court, the jury, the respondent, or his counsel, as to how it might be used. No such indication came from the court till all the evidence in the case was closed, and this evidence had done its work. We make no point of good or bad faith; we merely state a fact. If the jury found the defendant on other evidence guilty of this homicide, then there was no need of any more evidence. *Commonwealth* v. *Webster*, 5 Cush. 305; *Commonwealth* v. *York*, 9 Met. 93, and cases there cited from other state and foreign courts.

We are not driven to charge bad faith, or even that injustice was done. It is enough that it may have been done.

In *Regina* v. *Oddy*, 4 Cox C. C., Lord CAMPBELL, after saying "The law of England does not allow one crime to be proved in order to raise a probability that another crime has been committed by the perpetrator of the first," adds this logical and common-sense caution: "Allowing evidence to be given of the uttering of other forged notes to other persons has gone to great lengths, and I should be unwilling to see that rule applied generally in the administration of the criminal laws." Prejudice is a wily fellow in a jury-box. He had full license—*carte blanche*—with this testimony for a long time, before the court called him to any account. Hence the burden is on the other side. Not one of the jurors can tell how much his mind was confused or misled. Law is exceedingly jealous of both these clouds on reason and judgment; but the testimony was in there, liable to do mischief, and that is enough for our purpose.

In *Coleman* v. *People*, 55 N. Y. 90, a late case, it is said by the court, all the judges concurring on this point,—"The general rule is against receiving evidence of another offence," "however persuasive

the evidence may be in a moral point of view." Same case before the same court in 56 N. Y. 591, and affirmed. Up again in 58 N. Y. 555; general doctrine reäffirmed, where the court said,—" The true rule, and the only rule that can be sustained on principle, is, that the intendment of law is that an error in the admission of evidence is prejudicial to the party objecting, and will be ground for reversal of the judgment, unless the intendment is clearly repelled by the record. The error must be shown conclusively to be innoxious."

It is not this defendant alone who is on trial in this court. If he " has received no actual wrong," as we contend he has, and as there is, to say the least, a chance for, in piecing up the detached fragments of evidence in his case, law and the course of justice have a right to complain. We speak now for the integrity of the rules of evidence. We may have monsters of crime in our day. Old-fashioned notions may not be quite up to my brother's anxiety in dealing with cases of modern depravity. He seems still haunted by the ghost of one subject for a mad-house, sent to the halter on his own confession. And has he himself partaken of the insane root, that he would obliterate the line between judges and juries, and let men be tried for their lives on such " grounds of natural law, natural reason, and human experience," as any twelve men, picked by chance from like chance pickings from men selected without reference to special aptness or training, may chance to adopt in a jury-room ? Is he prepared to denounce any rule of evidence, deemed wise and salutary hitherto, as arbitrary and irrational, because it happens to stand in the way of a conviction of a man whom, in his zeal, he has come to regard as surely guilty ? Your honors might give some weight to the evidence on the question of interest, if certain both crimes were committed, and committed by the same person.

But just here, the " teaching of history and universal experience, your own knowledge of human nature, and the authority of an intuition superior to all artificial reasoning," all admonish you not to trust to a jury evidence of a fact entirely disconnected from the main fact and not made certain, from which to draw such inferences as their whim or caprice may dictate of a man who has been followed by a hue and cry of the whole community ever since the detectives first thought they scented his track, crossing the trail they were following of the first man by them beat out of cover in hunting for the author of this terrible tragedy. No man on earth would be willing to trust his life to such an ordeal.

In the next place, we will make short work of the rest of our bill of exceptions.

It need hardly be said that what has been considered we regard as its head and front. In justice to myself, perhaps, I ought to say that I rely but little on any of the rest.

All the testimony tending to prove his chasing the Watson girl we regard as clearly irrelevant, on the ground that it comes to nothing,

and therefore is mischievous.   It was two weeks before the murder ; it was three or four miles away from the scene of it, and not in the same direction from his residence ; it was a day, and the same time of day, when other people were out in the same locality, on what they, no doubt, deemed innocent pastimes.   At least two other men are shown to be on or near the same road at the same times and places when and where he was seen.   Nothing bad is shown of him but haste and excitement.   He was never seen near the girl except when her mother was present.

We wish to make this general remark as to all this class of testimony.   It is all open to two constructions.   None of it of necessity points to anything.   Taken against a man suspected, it becomes suspicious ; without extraneous aid, it is all entirely indifferent.   But what was submitted in a former brief is all that need be said on this point.

We make no appeals : we crave right and justice.   Give us a fair trial.   We expect to meet all the evidence properly connecting us with this horrid crime.   Against that we can take no exception.   But if the jury were improperly influenced in their findings by incompetent testimony,

> "—be it so much
> As makes it light, or heavy, in the substance
> Or the division of the twentieth part
> Of one poor scruple,"

then we have a right to complain.

· *Lewis W. Clark, attorney-general,* in reply.

For all the legal purposes of this case the charge is unexceptionable, because there is no question before this court in regard to its correctness.

### THE TESTIMONY OF JULIENNE ROUSSE.

I.  The defendant contends that the question is not whether this evidence is admissible for any purpose, but whether there is any purpose for which it is not admissible, and that the judgment should be reversed because this evidence is not competent to show that he killed the deceased.   His claim is, that evidence of the degree of guilt should be excluded, unless it tends to prove every other part of the case ; that evidence tending to show a homicide, " committed in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary," is incompetent, unless it also tends to show that the defendant is the murderer ; that when a murder is committed in the perpetration of arson, robbery, or burglary, evidence of a fire set, a pocket-book left open and empty in the highway, or a door or lock broken, is inadmissible if it does not bear upon every question into which the general issue may by ingenuity be divided ;—in short, that no evidence is admissible on any point unless it tends to prove every other point.   I do not think I should be justified in occupying the time of the court with any answer to this part of the defendant's argument.

II. The defendant contends that the evidence was inadmissible, because no actual proof of a raping intent was made essential by any allegations or answer in pleading or proof; that the act of killing being fixed upon the defendant, his crime, without other proof of intent, would be murder of the first degree. Under the decision in *State* v. *Pike*, 49 N. H. 399, 404, 405, 406, it was not necessary to allege in this indictment the defendant's perpetration of, or attempt to perpetrate, a rape. But, in order to convict the defendant of murder in the first degree, it was as necessary for the State to prove that degree of murder as if it had been necessary to allege it in the terms in which it is described in the statute. The first degree is no more presumed without proof of it, than a lower degree or a mere homicide without proof of it. *State* v. *Bartlett*, 43 N. H. 224; *State* v. *Jones*, 50 N. H. 369; *State* v. *Hodge*, 50 N. H. 510, 525, 526. The English presumption (accepted by the majority of the court in *Com.* v. *York*), that all homicide is malicious, is an error of old barbarous or semi-barbarous times not adopted here.

" Homicide may be lawful. It is well known to be so in many cases. In many more it is excusable or capable of extenuation; and if it may be so, if it often is so, whence the reason, where the justice, of attaching to that which may be lawful an inference of law that it is unlawful, and not only unlawful, but unlawful in the highest degree,—or murder? Why does not the presumption of innocence attach as much to the motive, the intent with which an act is done, as to the act itself? Innocence means innocent of any unlawful act, as well as of any act at all. If the burden of proving the act itself is on the government throughout, is there not the same burden of proving the malicious intent? It is an evasion of the point to say that the latter is proved, because it is by law inferred from the wrongful act itself. That assumes the very question in dispute. Was the homicide unlawful? The government asserts it; the accused denies it. The principle, that malice is to be legally inferred from the commission of a " wrongful act done intentionally without just cause or excuse," does not help us in the solution of the question. The questions still remain, Was the homicide wrongful? Was it intentional or accidental? Was it done without just cause or excuse? In other cases, criminal malice is not always implied from the commission of a wrongful act. In many states it is made a crime maliciously to destroy or injure another's personal property; yet it is perfectly well settled that such an offence is not made out by simple proof of a voluntary and wrongful injury to or destruction of such property. There must be proof of actual malice. 1 Bennett & Heard L. C. C. 361 (2d ed.).

A legal presumption, that all homicides are malicious, could be based on nothing but the fact that homicides are generally malicious. But the fact is, that not one in a thousand is malicious in the legal sense,— *i. e.*, criminally malicious. Compare all the murders of Europe during the last hundred years with the number of deaths caused by the lawful orders of the first Napoleon. How long a time would be necessary

to find as many persons murdered in this country as were lawfully slain in Virginia in 1864 ? War is not an exception. We are at war now, and have been nearly all the time since the first settlement of the country. War is, or is in law presumed to be, nothing but self-defence —a defence of rights which men may legally defend. Whether the right of defence be exercised by an organized community or by a single member of it; whether military powers join battle, or sheriffs inflict capital punishment, or rioters are shot, or other persons resisting authority are killed, or individuals take life for the prevention of atrocious crimes which cannot otherwise be prevented; whether homicide is committed under unavoidable necessity in the defence of private rights or the advancement of public justice,—the principle is the same. And when so small a portion of homicides are unlawful, what ground is there for presuming them all unlawful ?

Leave the military and the official destruction of life out of the account, and consider only private homicides. Many of them are so clearly lawful that they are never brought to the notice of a grand jury. And, when indictments are found, in how small a portion are there convictions of murder in the second degree; and how much smaller a portion are adjudged to be of the first degree. Vice and villany of all kinds and degrees abound; but a legal presumption that all homicide is capital crime, would be a gross violation of truth, and a cruel oppression of the accused.

Our juries are always instructed that they cannot find the defendant guilty of the first degree of murder, unless they are satisfied by the evidence, beyond all reasonable doubt, that the defendant killed the deceased " by poison, starving, torture, or other deliberate and premeditated killing, or in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary." In this case, the state undertook to comply with that requirement, in the first place, by proving, by other evidence than that of Julienne Rousse, that the defendant assaulted and killed the deceased ; and, in the second place, by proving by a variety of evidence, including that of Julienne Rousse, that his assault upon the deceased was made with a raping intent. The defendant objects to evidence as unnecessary which tends to prove one of the intents necessary to the first degree. On the question of degree, the court tell the jury that the burden of proof is on the state, and they must be satisfied by the evidence beyond a reasonable doubt : the defendant asks that the verdict be set aside, because evidence was admitted to prove that point without proof of which his execution would be a judicial murder. The exclusion of evidence of intent would be the repeal of an elementary principle, and the sacrifice of a vital right of every person on trial for his life. From seeking such a subversion of law and justice, a convict is not deterred by its shocking inhumanity.

III. The defendant proposes the introduction of a distinction between "a mere incident" and " an element or the burden of the evidence." Such an amendment of the law would be an exceedingly attenuated

refinement of legal language, and a perversion of legal principle. Proof of intent, motive, malice, or any mental condition, is competent when the intent, motive, malice, or mental condition is a fact material in the case ; and when such a fact is material, the proposed distinction between incident and element is immaterial.

IV. The defendant admits (what no lawyer would think of denying) that when the " *quo animo* becomes an essential factor in the problem of guilt or innocence to be solved," " such evidence of other like acts may be competent." What fact in this case is a more " essential factor," a more relevant and material fact, than the *animus*, the intent, with which the defendant assaulted the deceased ? At the trial, the question of that intent was for him an issue of life or death ; and so it is now, and will be while this case remains in the hands of a human tribunal. His life depends on that intent. And in what sense would language be used, if it were said that a fact upon which the law makes his life depend is immaterial. His intent is as material as his life, which is the only thing against which the judgment runs, and against which the judgment would not run if the intent had not been proved at the trial.

In a great number of the decided cases in which evidence of the intent with which other similar acts were committed has been held competent, the defendant claims the intent was " peculiarly material." " In such cases," he says, " the intent is always material to be proven." Intent is either material or immaterial ; and its materiality is a legal question. But, in admitting and rejecting evidence, the law does not proceed upon a distinction between evidence that is and evidence that is not " peculiarly material." And if there were a rule of evidence based on such an indeterminate distinction, what would be more " peculiarly material " in the defendant's case, than an intent which is decisive of the question whether he shall live or die ?

The defendant admits that when the criminality of an act depends upon the intent with which the act is done, the intent " may well be learned from other acts of the same kind." Homicide may be lawful ; it may be unlawful ; it may be a crime ; it may be a moral and legal duty. Its character depends upon the occasion, the circumstances, and the intent. Of itself, it is as indifferent as any other act the guilt of which consists in intent. 4 Bl. Com. 176–188. If the defendant killed the deceased accidentally, and without fault, he is innocent. If he killed her in the necessary defence of his child, his act was meritorious. His raping intent may be proved because it is material. It must be proved in order to convict him of a capital crime. If it had not been proved, I should have moved to set aside the verdict as a murderous mistake.

V. The defendant says,—" Courts have no discretion in admitting or rejecting legal testimony," and " hanging ought not to go by discre-

tion." In the bill of exceptions, the court, transferring "all questions as to the exercise of discretion," evidently used the word "discretion" in the technical sense in which it is used in legal decisions and arguments. Judicial discretion is "the exercise of final judgment by the court in the decision of such questions of fact as, from their nature and the circumstances of the case, come peculiarly within the province of the presiding judge to determine." *Bundy* v. *Hyde*, 50 N. H. 116, 120. "Judicial discretion, in its technical, legal sense, is the name of the decision of certain questions of fact by the court." *Darling* v. *Westmoreland*, 52 N. H. 401, 408. "No doubt there would be some limits as to time and circumstances beyond which evidence of uttering forged instruments on other occasions would not be permitted. What these limits are, it is for the judge in his discretion to determine." Roscoe Crim. Ev. 95 (7th ed.) "In regard to the distance of time (or place) between the principal fact in issue and the collateral facts proposed to be shown in proof of the intention, so far as it affects the admissibility of the evidence no precise rule has been laid down, but the question rests in the discretion of the judge." 3 Gr. Ev., sec. 15, and authorities cited in my former brief.

VI. The competency of evidence of intent is not affected by the distinction between offences that are and those that are not capital. When there were one hundred and sixty capital crimes, the question was not what offences were, but what were not capital. Passing counterfeit money (third offence), trifling embezzlements by servants, insignificant thefts, and a great variety of petty delinquencies, as well as forgery, arson, robbery, burglary, &c., were punished by death. 1 Montague on Punishment 82. The legislative reduction of the penalty is no reason for a judicial alteration of the rules of evidence increasing the difficulty of proving the criminal intent.

VII. In *Shaffner* v. *Com.*, 72 Pa. St. 60 (a case upon which the defendant relies), the judgment was reversed on the ground that the evidence of the defendant's having poisoned Sharlock was received as evidence that he poisoned his own wife Nancy. "In substance," say the court, "this was an offer to show that the prisoner poisoned Sharlock, as evidence that he also poisoned his own wife." It was held that there was no evidence of the defendant's previous purpose to marry Sharlock's wife Susan. The court say,—"The previous purpose to marry Susan is the broken link in the chain to complete the connection, without which the deaths of both are not so probably connected as to make Sharlock's death evidence on the trial for the death of Nancy." If that decision were in point in this case, I should insist that the adulterous intercourse between the defendant and Susan, and Sharlock's life insurance money, obtained by the defendant, left no such broken link; and that the decision was reached by weighing the evidence and drawing an inference of fact which could not be drawn by a court of law passing upon the legal question. But that decision has no bearing on the competency

of proof of intent. The only question considered in relation to the competency of evidence was, whether the act of poisoning Sharlock tended to prove the act of poisoning Nancy. The jury were instructed that " if the prisoner is guilty at all, there can be no difficulty in ascertaining the degree of guilt, for, being by poison, it must necessarily be murder of the first degree, if purposely administered ; "—and that instruction was held right. The reversal of the judgment was based on a supposed broken link in the chain necessary to the inference of one act from another, and not on a violation of the rule that allows the intent of one act to be inferred from the intent of a similar distinct act,— a rule which the court, in *State* v. *Renton*, 15 N. H. 169, 175, expressly declared they did not infringe.

VIII. When the defendant says, " No claim is made that the evidence helps to find intent only in so far forth as it helps to find a bent of mind or inclination to commit that kind of crimes," he misapprehends the argument which I endeavored to present in my former brief. The State claims that it is settled by all the authorities, and admitted by the defendant, that when the intent with which the defendant's act was done, or the intent with which he had possession of a person or thing, is a material part of a crime charged against him, evidence is admissible to show the intent of his acts on other occasions. The State claims that a raping intent is a material part of the crime charged against this defendant ; that, under the circumstances of this case, without proof of such an intent, he could not be and ought not to be convicted of the first degree of murder ; and that, under the specific instructions given by the court, the jury found, on other evidence than that of Julienne Rousse, that the defendant killed Josie Langmaid. With that verdict, the facts stated in the bill of exceptions show that he killed her, not by poison or starving, but by seizing her, taking possession of her, and making an assault upon her ; and the State claims that, as matter of law, the intent with which he seized, took possession of, and assaulted other young women, is evidence of the intent with which he seized, took possession of, and assaulted this victim. Whether the fact that he assaulted, killed, or had sexual intercourse with others, is evidence that he committed a like act upon the deceased, is not a question here. For the purposes of this case, let it be as well settled as the defendant may have reason to wish, that the fact of his having committed a certain act upon others, and his general disposition to commit such an act, are not legal evidence that he committed a similar act upon the deceased. It is equally well settled that his intent, in one act or possession, is evidence of his intent in another similar act or possession. The defendant admits that the law is so when the intent is peculiarly material. And if his intent, in this case, is not peculiarly material, there is no imaginable case in which it would be. Mere intent to kill is not criminal ; and when a homicidal intent acquires a criminal character from the occasion, the circumstances, or the motive, it does not carry homicide to the highest degree of guilt, except in the

few cases specified in the statute. The defendant's intent to kill the deceased is not the gist of the capital offence of which he has been *convicted*. His raping intent is the fatal fact. To be fatal, it must be proved. The methods of proving it are prescribed by the general rules relating to intent, and not by those relating to acts.

There is no inconsistency when the law admits the special and peculiar intent of other similar acts of the defendant on other occasions as evidence of his intent in the act in question, and does not admit such other acts as evidence of the alleged act. In the former case, it may fairly be inferred that his similar acts on different occasions were done with like intent, though without any unity or continuity of plot. In the latter case, it would be a very different thing to infer an act on one occasion from his commission of similar acts on other occasions, without anything to show that they all came within one settled plan and fixed purpose. If a child—yours or mine—should mysteriously disappear, we might not think that the abduction of Charlie Ross tended to show that both children had been taken by the same person. But if the kidnapper of the Ross boy were proved to have taken yours or mine, and the question were with what intent he made the seizure, would anybody doubt that his proved intent to extort a ransom from Mr. Ross tended to show an intent to rob you or me in the same manner ? What difference is there in the principles of evidence applicable to such cases, whether the victims are of one sex or the other, whether the alleged intent of the brigand is to make money by extorting ransoms from parents or by sending captives into slavery, as in *Com.* v. *Turner*, or to gratify some other passion than avarice, as in this case and in *State* v. *Evans ?*

The intent of one act may be inferred from the intent of other similar acts, though the one act may not be inferred from the others. If it be said that the legal difference between such inferences is a mere difference in their strength, my answer is, that the law permits the stronger of the two, and does not permit the other to be drawn ; and that my business here is to contend for the law as it is, and not to argue the question whether the law ought to be so changed as to tolerate both inferences or prohibit both.

The rule, which (with various qualifications and exceptions) forbids one act to be inferred from other similar acts, or (what is the same thing) from a general disposition, inclination, or tendency to commit such acts, is found only in that small part of the world where the common law prevails. As suggested in *Darling* v. *Westmoreland,* pp. 407, 408, this peculiarity of English law may have been a piece of judicial legislation in mitigation of the undiscriminating and merciless severity of a criminal code of one hundred and sixty capital offences. But I do not invite the court to investigate the origin of that rule ; I do not argue that the reason of it has ceased, and that it is not adapted to a criminal code of a solitary capital offence ; I do not ask the court to reject it on that or any other ground : but I do insist that, in our humane code, in the increase of crime, the new perils of the defence-

less, the panic of parents, and the terror that reigns in many other places as well as on academy roads, in the constant obstruction and frequent defeat of justice by mistaken pity, sentimental influences, the general relaxation of principle, demoralization of society, and decay of government, there is nothing that can induce the court to wish they had the power to change the law by excluding the defendant's intent in one act on the question of his intent in another similar act. How fearfully such a change would cripple the arm of justice, and endanger private rights of person, reputation, and property, they who have been engaged in the administration of the criminal law well know. We need all the just, reasonable, and efficient means now available for detecting, convicting, and punishing the lawless, and restraining the elements of society that are hostile to its welfare. No competent evidence can be spared. An inference as to the defendant's intent in one act, may be drawn from his intent in other similar acts. That rule cannot be safely annulled. I contend for it, as law, imperatively required by reason and justice, indisputably established by the authorities, and explicitly admitted by the defendant; and I anxiously hope that my successors may not be disabled in the performance of their duties by the abolition of a rule so necessary for the protection of the community.

CUSHING, C. J.  The testimony of Fowler, Mahair, the Towles, the Watsons, and Mercy, was, I think, properly admitted. It all tended to show that the prisoner, about the time of the murder, was frequenting that neighborhood with a view to the commission of the crime of rape upon the person of some one of the young females whom he knew to have occasion to pass over that road. The obscene and filthy language he is described as using, in connection with his inquiries about one of the young ladies, tends to show what thoughts were in his mind, and what he was meditating. The testimony of the Watsons and Mercy tends to show, not merely an attempt or design to commit the crime on the person of Miss Watson, but also to show generally, in connection with the other testimony, that he was prowling about that place for the purpose of lying in wait for any person whom he might sacrifice to his base and cruel designs. It furnishes an illustration of the doctrine which I shall attempt to illustrate and maintain. The attempt to commit one offence may be put in evidence when attended with circumstances which give it a logical connection with the fact in issue, and not otherwise.

The admission of the testimony of Julienne Rousse gives rise to by far the most important question in the case. That testimony tended to prove that the prisoner, about four years and a half before the trial, at a place beyond the jurisdiction of the United States, committed the crime of rape upon a person other than the deceased; and the question is, whether that bald, naked fact, being put in evidence, had any tendency to prove any matter in issue between the State and the defendant.

These questions in regard to the relevancy of particular items of tes-

timony always depend upon the peculiar circumstances of the case, and must be solved by the application of sound judgment and common sense. It very often happens, as practical men in the profession well know, that facts which in one state of the evidence and one aspect of the case are entirely irrelevant, suddenly, by a slight change in the conditions, become of great importance. Hence the necessity, which so often happens in attempting to take written testimony, of introducing into a deposition so many facts which at first sight seem entirely irrelevant, but which may become admissible and important ; hence, too, one reason why in criminal causes it is so important that the witnesses should testify in open court, and in the presence of the respondent, in order that all their knowledge should be available to meet all the exigencies of the trial.

It is for this reason that so many reported cases in the law of evidence are valuable, not so much in establishing principles of law, as for the illustration of those principles.

There is a great mass of cases so similar in their circumstances, and which have occurred so often, that they may be taken as evidence of the application of the common-sense and cultivated reason of a great many individuals, and so come to have the force and authority of established law.

I think we may assume, in the outset, that it is not the quality of an action, as good or bad, as unlawful or lawful, as criminal or otherwise, which is to determine its relevancy. I take it to be generally true, that any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue. It may be, that in some cases the danger resulting from such indirect bearing might be so great in comparison with its importance in regard to matters on which its bearing was legitimate, that it ought not to be admitted. But I think the general rule is, that no testimony which has a legitimate bearing upon any point in issue can be excluded.

I say *legitimate bearing* advisedly, because, as already suggested, although undoubtedly the relevancy of testimony is originally a matter of logic and common-sense, still there are many instances in which the evidence of particular facts as bearing upon particular issues has been so often the subject of discussion in courts of law, and so often ruled upon, that the united logic of a great many judges and lawyers may be said to furnish evidence of the sense common to a great many individuals, and, therefore, the best evidence of what may be properly called *common*-sense, and thus to acquire the authority of law. It is for this reason that the subject of the relevancy of testimony has become, to so great an extent, matter of precedent and authority, and that we may with entire propriety speak of its legal relevancy.

It is proper, however, in the outset, to notice what appears to me to be a fallacy in the very commencement of the able argument for the

State. It says,—" Under an unexceptionable charge, and upon other testimony than that of Julienne Rousse, the jury have answered the first question [*i. e.*, Did the defendant kill the deceased?] in the affirmative." If it could be known certainly that the jury did not give any weight to the testimony excepted to in determining whether the prisoner did the act; if it could be certainly known that the evidence of Julienne Rousse did not create in the minds of the jury a prejudice against the prisoner on all the points of his case,—the remark might be well founded. But that is just what we do not and cannot know, although what we do know of the constitution and temper of juries creates in us a very strong belief of the contrary.

In this case I understand it to be conceded by the government that the evidence is not relevant for the purpose of showing who killed the deceased, but that it is claimed to be relevant for the purpose of showing the particular act that he was engaged in doing when he committed the murder. For the purpose of showing the offence to be murder in the first degree, it is claimed to be relevant as tending to show that.he committed the murder while in the act of committing rape; but as the intent is the mysterious solvent which opens the way for the admission of the testimony, it would not be relevant for the purpose of showing that he had first committed a rape, and then did the murder afterward.

Proceeding, then, to consider what has been settled in this matter, I think we may state the law in the following propositions :

1. It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character.

2. It is not permitted to show the defendant's bad character by showing particular acts.

3. It is not permitted to show in the prisoner a tendency or disposition to commit the crime with which he is charged.

4. It is not permitted to give in evidence other crimes of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions.

It is a maxim of our law, that every man is presumed to be innocent until he is proved to be guilty. It is characteristic of the humanity of all the English speaking peoples, that you cannot blacken the character of a party who is on trial for an alleged crime. Prisoners ordinarily come before the court and the jury under manifest disadvantages. The very fact that a man is charged with a crime is sufficient to create in many minds a belief that he is guilty. It is quite inconsistent with that fairness of trial to which every man is entitled, that the jury should be prejudiced against him by any evidence except what relates to the issue; above all should it not be permitted to blacken his character, to show that he is worthless, to lighten the sense of responsibility which rests upon the jury, by showing that he is not worthy of painstaking

and care, and, in short, that the trial is what the chemists and anatomists call *experimentum in corpore vili.*

Of course, if the respondent sees fit to put his character in issue by offering evidence tending to show that it is good, it is then permitted to the prosecution to rebut this testimony by showing that it is bad; but I think the weight of authority is to the effect that this must be done by evidence, not of particular facts, but of reputation.

The law in regard to proof of intent, is, I apprehend, in no particular different from the law in regard to the proof of other facts, unless it may be in the general principle that a person is ordinarily presumed to intend the natural consequences of his actions. But always the evidence will be subject to the condition that it legally and logically tends to prove the facts in issue, whether it be the intent or any other fact.

The foregoing positions are illustrated, and I think established, by the following citations:

" Where a defendant has voluntarily put his character in issue, and evidence for the prosecution has been introduced, it has been said the examination may be extended to particular facts,—though this has lately been denied by courts of high respectability; and certainly it is very oppressive to a defendant, as well as irrelevant to the real issue, to admit in rebuttal a series of independent facts, forming such a constituent offence." 1 Wharton's Am. Crim. Law, and cases cited, sec. 637.

" While, however, bad character cannot be put in issue by the prosecution, it is permitted to introduce evidence of prior misconduct, where it is relevant either to prior malice towards an individual, or guilty knowledge." Wharton, sec. 639, and cases cited.

" But in other criminal cases the prosecutor cannot enter into the defendant's character, unless the defendant enable him to do so by calling witnesses in support of it,—and even then the prosecutor cannot examine into particular facts, the general character of the defendant not being put in issue, but coming in collaterally." Buller's Nisi Prius 296.

" But it is not competent for the government to give in proof the bad character of the defendant, unless he first opens that line of inquiry by evidence of good character." *Com.* v. *Webster,* 5 Cush. 325.

It will be seen that these authorities support not only the first proposition above stated, but also the others.

I also cite the following authorities in support of the other propositions, which, it seems to me, need no further support.

"It is here, however, that the fundamental distinction begins, for while particular acts may be proved to show malice or *scienter,* it is inadmissible to prove, either in this or any other way, that the defendant had a tendency to the crime charged. Thus, in England, it has been held that on the trial of a person charged with an unnatural crime, it was not permitted to prove that the defendant had admitted that he had a tendency to such practices; and so, on an indictment against an overseer on a plantation for the murder of a slave, evidence as to the prisoner's general habits as to punishing other slaves is not admissible

for the prosecution." 1 Wharton's Am. Crim. Law, sec. 640, and cases cited.

" So, proof of a distinct murder, committed by the defendant at a different time, or of some other felony or transaction committed upon or against a different person and at a different time, in which the defendant participated, cannot be admitted until proof has been given establishing or tending to establish the offence with which he is charged, and showing some connection between the different transactions,—or such facts or circumstances as will warrant a presumption that the latter grew out of, and was to some extent induced by, some circumstances connected with the former ; in which case such circumstances connected with the former as are calculated to show the *quo animo* or motive by which the prisoner was actuated or influenced in regard to the subsequent transaction are competent and legitimate testimony." 1 Wharton's Am. Crim. Law, sec. 647, and cases cited.

In *Regina* v. *Oddy*, 4 Eng. L. & E. 572, it was held that " On an indictment for feloniously receiving goods knowing them to have been stolen, it is not competent for the prosecutor, in proof of guilty knowledge of the prisoner, to give in evidence that the prisoner, at a time previous to the receipt of the prosecutor's goods, had in his possession other goods of the same sort as those mentioned in the indictment but belonging to a different owner, and that those goods had been stolen from such owner.

"Lord CAMPBELL, C. J. I am of opinion that the evidence objected to was as admissible under the two first counts as it was under the third, for it was evidence which went to show that the prisoner was a very bad man, and a likely person to commit such offences as those charged in the indictment. But the law of England does not allow one crime to be proved in order to raise a probability that another crime has been committed by the perpetrator of the first. The evidence which was received in the case does not tend to show that the prisoner knew that these particular goods were stolen at the time that he received them. The rule which has prevailed in the case of indictments for uttering forged bank-notes, of allowing evidence to be given of the uttering other forged notes to different persons, has gone great lengths, and I should be unwilling to see that rule applied generally in the administration of the criminal law. We are all of opinion that the evidence admitted in this case with regard to the *scienter* was improperly admitted, as it afforded no ground for any legitimate inference in respect of it. The conviction, therefore, must be quashed." *Regina* v. *Oddy*, 4 Eng. L. & Eq. 574.

In *Schaffner* v. *Commonwealth*, 72 Pa. St. (13 Am. Rep.), the prisoner was indicted for the murder of his wife by poison. There was evidence of his criminal intimacy with the wife of S., on whose life was an insurance, the proceeds of which, on his death, the defendant had tried to procure. Held, that evidence that S. died with the same symptoms as the defendant's wife, and had been attended by the defendant, was inadmissible.

AGNEW, J., in his opinion, said,—" It is a general rule, that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground that, having committed one crime, the depravity it exhibits makes it likely he would commit another. Logically, the commission of an independent offence is not proof, in itself, of the commission of another crime; yet it cannot be said to be without influence on the mind, for certainly, if one be shown to be guilty of another crime equally heinous, it will prompt a more ready belief that he might have committed the one with which he is charged. It therefore predisposes the mind of the juror to believe the prisoner guilty. To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or, it must be necessary to indentify the person of the actor by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burden a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence it is obvious it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner. If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact carrying with it no proper evidence of the particular guilt." *Shaffner* v. *Commonwealth*, 13 Am. R. 651.

" It is, therefore, not competent for the prosecutor to give evidence of facts tending to prove another distinct offence for the purpose of raising an inference that the prisoner has committed the crime in question ; nor is it competent to show that he has a tendency to commit the offence with which he is charged. Thus, on a prosecution for an infamous offence, an admission by the prisoner that he had committed such an offence at another time was held to have been properly rejected. *Rex* v. *Cole*, cited in 1 Phillipps on Ev. 499 (8th ed.)." *State* v. *Renton*, 15 N. H. 174.

The case of *People* v. *Corbin*, 56 N. Y. 363, well illustrates the practical application of this doctrine. The indictment was for forging the endorsement of one Van Amburgh on a promissory note. The defence was, that the prisoner was authorized to sign Van Amburgh's name. The prisoner had had such authority, but the prosecution attempted to show that the authority had been revoked. The question of the prisoner's guilt or innocence depended upon the inquiry whether the prisoner honestly believed that he was authorized to make the endorsement, or whether he knew that the authority had been revoked, and

signed Van Amburgh's name with criminal intent. To establish such intent, evidence was offered tending to show his acknowledgment that he had made a similar unauthorized use of the name of his father-in-law on other notes. The county judge charged the jury as follows : " While the proof that he has been guilty of other forgeries is not evidence upon which you are to convict him of this forgery, yet the proof of other forgeries in connection with this, so far as they are in the case, you have the right to consider, in determining what his intentions were at the time this paper was made and uttered. So far, you may consider all that character of evidence in the case, in determining the intent at the time this paper was made and uttered." The judge also, in his charge, said,—" The fact that the defendant is guilty of other forgeries is no evidence to prove that he committed this forgery. So far as his admissions to Ganoung concede the commission of forgeries against Ganoung, they may be considered by you in determining what was his intent at the time this note was made and uttered."

The verdict was set aside, and a new trial granted.

RAPALLO, J., in delivering the judgment of the court, said,—" The cases in which offences other than those charged in the indictment may be proved, for the purpose of showing guilty knowledge or intent, are very few ; and this, we think, is not one of them. The fact that the prisoner made an unauthorized use of the name of Ganoung, if established, shows that he was morally capable of committing the same offence against Van Amburgh, but does not legitimately tend to show that he did so, or that he knew and understood that Van Amburgh's authority had been withdrawn, or that the signature in question had been made with criminal intent." *People* v. *Corbin,* 15 Am. R. 429.

The cases which have been cited by counsel for the government afford full illustration of the principles laid down in what has been said before.

It is proper, however, to remark what seems to me to be a fallacious use of the word *intent.* Ordinarily, intent is, I think, an inference of law from acts proved. The maxim is, that every man must be taken to intend the natural consequences of his acts ; and if he knowingly and voluntarily does an act which is in violation of law, he is held to have intended to violate the law. This I think would be true, whether he did or did not know that the act was unlawful. Thus, if a man should knowingly and voluntarily utter a forged bank-note, or a counterfeit coin, he would be held guilty whether he did or did not know that the act was unlawful.

The cases cited by counsel for the government admit of being classified into several distinct groups.

In the first place is the class of cases in which other offences are shown for the purpose of proving guilty knowledge. To this class belong those cases in which, in the trial of indictments for uttering forged bank-notes, or counterfeit coin, the proof of other offences of the same kind is admitted. It might well happen that a person might have in

his possession a single counterfeit bill or coin without knowing it to be such; but he would be much less likely to do so twice, and every repetition of such an act would increase the probability that he knew that the bills or coins were counterfeit. If he did know it, the guilty intent would be an implication of law, and not an inference of fact. To this class belongs the case of *Reg.* v. *Roebuck*, cited in the brief.

/ Another class of cases consists of those in which it becomes necessary to show that the act for which the prisoner was indicted was not accidental,—*e. g.*, where the prisoner had shot the same person twice within a short time, or where the same person had fired a rick of grain twice, or where several deaths by poison had taken place in the same family, or where children of the same mother had mysteriously died. In such cases it might well happen that a man should shoot another accidentally, but that he should do it twice within a short time would be very unlikely. So, it might easily happen that a man using a gun might fire a rick of barley once by accident, but that he should do it several times in succession would be very improbable.

So, a person might die of accidental poisoning, but that several persons should so die in the same family at different times would be very unlikely.

So, that a child should be suffocated in bed by its mother might happen once, but several similar deaths in the same family could not reasonably be accounted for as accidents.

So, in the case of embezzlement effected by means of false entries, a single false entry might be accidentally made; but the probability of accident would diminish at least as fast as the instances increased. To this class of cases belong *Rex* v. *Voke*, *Reg.* v. *Geering*, *Reg.* v. *Cotton*, *Reg.* v. *Roder*, *Rex* v. *Mogg*, *Reg.* v. *Dossett*, *Reg.* v. *Bailey*, *Reg.* v. *Proud*, *Reg.* v. *Richardson*, cited in the brief for the prosecution.

There is another class of cases in which proof of the commission of one crime tends to show a motive for the commission of the crime with which the prisoner is charged. /

"A. was indicted for the murder of H. It was opined that A., having malice against P., had hired H. to murder him, and that H. did so; but that H. being detected, A. had murdered H. to prevent a discovery of his (A.'s) guilt respecting the murder of P. Evidence was given of expressions of malice used by A. towards P., and it was held that the prosecutor might also give evidence to show that H. was in fact the person by whom P. had been murdered." *Rex* v. *Clewes*, 6 Car. & P. 221; Littledale, Har. D. 1, 1942.

" On trial of the petitioner for the murder of his wife, in the absence of direct evidence, proof of an adulterous intercourse between the prisoner and another woman is admissible, to repel the presumption of innocence arising from the conjugal relation." *State* v. *Watkins*, 9 Conn. 47 ; 2 U. S. D. 288.

So, in *Com.* v. *Ferrigan*, the adulterous intercourse of the defendant with the wife of the deceased tends to show a motive for the murder.

In cases of indictments for obtaining goods under false pretences, it very often happens that the respondent has been in some kind of business of which buying and selling goods on credit makes a part; and in such case the difficulty is, to draw the line between the points where legitimate business ceases and fraud begins. In such cases a single purchase of goods on credit might happen in the ordinary course of business; but if a party should make several purchases of goods at a time when he was in failing circumstances, that fact would have some tendency to show that he knew that he was in failing circumstances, and that he did not intend to pay for them, or expect that he should be able to do it. Of course the effect of such testimony would depend upon the number and amount of such purchases, the after-disposition of the goods purchased, and all the other circumstances. To this class belong the cases of *Com.* v. *Eastman, Bradley* v. *Obear,* and *Hovey* v. *Grant.*

Another class of cases consists of those in which the evidence tends to show a general plan or conspiracy, one act of which was that which is in issue. To this class belong *Mason* v. *The State,* and perhaps *Com.* v. *Turner & Shearer.*

If the indictment were for being a common seller of spirituous liquor, the charge could be proved in hardly any other way than by showing many specific acts; and conversely, if a man were proved to be a professional counterfeiter, that would be evidence tending to show his guilty intent. Of this description are *Rex* v. *Balls* and *Com.* v. *Edgerly.*

In the case of sexual crimes, as fornication and adultery, where the object is to prove that the respondent has committed the crime with a particular individual, evidence tending to show previous acts of indecent familiarity would have a tendency to prove the breaking down and removal of the safeguards of self-respect and modesty, and the gradual advance, step by step, to the crime. Proof of the actual commission of the same crime would still more strongly tend to show the removal of those safeguards, and still more to make probable the commission of the crime on trial. To this class belong *Com.* v. *Horton, Com.* v. *Thrasher, State* v. *Wallace, State* v. *Marvin, Com.* v. *Merriam,* and *Com.* v. *Lahey.*

It should also be remarked that this being a matter of judgment, it is quite likely that courts would not always agree, and that some courts might see a logical connection where others could not. But however extreme the case may be, I think it will be found that the courts have always professed to put the admission of the testimony on the ground that there was some logical connection between the crime proposed to be proved other than the tendency to commit one crime as manifested by the tendency to commit the other.

In the case under consideration, I cannot see any such logical connection, between the commission of the rape upon Julienne Rousse and the murder of Josephine Langmaid, as the law requires. I am unable to see any connection by which from the first crime can be inferred

that the respondent was attempting the commission of a rape when he committed the murder, if he did it, other than such inference as I understand the law expressly to exclude. Proof of the first crime would show that the respondent was a very bad man—would perhaps show a tendency or disposition to commit that particular crime; but it would go no further, and in fact would amount to little more than an attack upon the respondent's character, which is inadmissible unless he puts it in issue, and an attack upon his character by showing particular acts, which is also inadmissible.

There is another consideration which makes necessary the extremest caution in the admission of this kind of testimony, and that is, the hardship which would be imposed upon the respondent by raising such collateral issues, and the great complication which might be introduced into the trial. I do not by any means intend to assert that this consideration is conclusive. I do not see how, if the collateral fact has a legal tendency, on the principles I have stated, to prove the fact in issue, it can be excluded.

It seems to me clear, that if the evidence of the rape of Julienne Rousse were admissible, it would be equally admissible to prove the commission of any other similar offence, and that the government would not be confined to direct evidence of the fact.

We learn from the newspapers of the day that there is a vehement suspicion that the same person who murdered Josephine Langmaid murdered Miss Ball at St. Albans, and it would be equally admissible to try that case and show that fact as the other. The necessity of proving that fact, partly or wholly by an elaborate combination of circumstantial evidence, would not, that I can see, make it any the less admissible. It would certainly be an extreme hardship on the prisoner to compel him to enter upon such an investigation. I mention this case to illustrate the necessity of extreme caution not to admit such testimony unless there can be seen some distinct logical connection, such as the law requires, between the fact proposed to be proved and the fact in issue.

In the case of *State* v. *O'Brien*, 119 Mass. 342, the law in regard to the admissibility of evidence as to character is very fully and satisfactorily discussed. The distinction, that the term *character* concerns what the man is, and the term *reputation* concerns what is said of him, is kept plainly in view; and it is clearly shown that the only legitimate mode of proving character is by showing reputation.

Now, I think a careful examination of that part of the charge which relates to this evidence will show that it really, in substance, amounted to instructing the jury that they were to find the character of the prisoner from the fact proved by Rousse, and infer from such character that he would be likely to be actuated by passion and lust. It was really instructing the jury that they might find, from a particular act proved, the prisoner's character as a man possessed by unlawful and lustful passion, and infer from that that he was actuated by such passion in his conduct to the deceased. The matter really reduces itself

to attacking the prisoner's character by the proof of particular acts, which the authorities clearly show to be inadmissible.

This portion of the charge, though not expressly excepted to, is mentioned as showing the particular view with which the evidence excepted to was admitted.

LADD, J.  " All murder committed  *  *  *  in perpetrating or attempting to perpetrate rape  *  .*  *  is murder in the first degree." Gen. Stats., ch. 264, sec. 1.  The State claimed (1) that the prisoner murdered Josie A. Langmaid; and (2) that the murder was committed in perpetrating or attempting to perpetrate upon her the crime of rape. Both these facts were put in issue by the plea of not guilty.  It was for its supposed bearing on the second issue that the testimony of Julienne Rousse was admitted; and the judge who charged the jury guarded against any other application of that evidence, so far as a direction from the bench could have that effect upon the minds of the jury.  The ground upon which the jury were told they might consider it, in determining whether the prisoner was perpetrating or attempting to perpetrate a rape when he committed the murder, was, that it bore upon the question of intent; and the ingenious, not to say subtle, argument of the attorney-general rests wholly, as I understand it, on the same ground. He says,—" If he [the prisoner] had passed counterfeit money at the time and place when and where he raped Julienne Rousse, and other counterfeit money had been found in his possession at the time and place·when and where he killed Josie Langmaid ; if he had got a negro boy into his possession at the former time and place with intent to send him into slavery, and had got another negro boy into his possession at the latter time and place,—would there be any doubt that his intent on the former occasion would in fact be considered by every intelligent member of the human family as entitled to some weight on the question of his intent on the latter occasion ?  *  *  *  What is there in the act, the circumstances, or the intent of kidnapping, or passing counterfeit money, that makes us feel the probative force of the proved intent of one occasion upon the question of intent four years and four months afterwards, and prevents our feeling any probative force of such evidence in the present case ? "  Starting, then, with the claim that this evidence was admissible upon the question of intent, it is necessary to understand just what intent is·meant.  Was it an intent to commit the crime of murder ?  Certainly not.  That crime must be fully made out, as the learned judge correctly told the jury, by other and entirely independent evidence.  He said,—'·' It is a fundamental principle of law, that evidence that a defendant committed one offence cannot be received to prove that he committed another and distinct offence.  This principle we must take care not to violate.  And, therefore, you are not to regard the evidence of Julienne Rousse as any proof or evidence that the prisoner killed Josie Langmaid.  Therefore, unless you find from *other* evidence, entirely independent of that of Julienne Rousse, that the prisoner killed and murdered Josie Langmaid, you must

reject her evidence altogether." This, of course, covers all questions of intent, so far as regards the crime of murder.

Was it an intent to commit murder in the first degree ? The answer to this is surely in the negative. Such a general intent could only be shown by evidence of a deliberate and premeditated killing in one of the ways pointed out by the statute, or otherwise. Besides, this question, like the other, seems to be fully answered by the charge. The jury were told that " the evidence is open to your consideration, if at all, only so far as it may seem to you to bear upon the *character* of the homicide of Josie Langmaid ; only as it may bear upon the question whether she was murdered by the prisoner in perpetrating or attempting to perpetrate rape." The intent, then, which it is claimed this evidence was admissible to establish, was an intent to perpetrate or attempt to perpetrate the crime of rape upon Josie A. Langmaid at the time he murdered her. But an intent to perpetrate rape, or to attempt the perpetration of that crime, is not what the statute requires to make the killing murder in the first degree. The most that can be said is, that intent may constitute an element in those crimes, as in most others. To meet the requirement of the statute, the act as well as the intent must be shown. The whole crime of perpetrating or attempting to perpetrate rape must be made out, and that includes all questions of intent that may be involved. Was he in the act of perpetrating or attempting to perpetrate rape at the time he did the killing ? To this the state said Yes ; the prisoner, No. Here was a clear and distinct issue ; just as clear and just as distinct as though there had been nothing else in the case. The state charged rape, or an attempt to commit that crime, as the basis of their claim that the verdict should be murder in the first degree. This charge they must prove, or the claim based upon it fails. The question is, How is it to be proved ? What is the rule of evidence to be applied ? Is evidence to be received upon the trial that would be inadmissible if the charge were rape alone ? If so, upon what ground ? What principle of law, or logic, or humanity, will admit evidence to prove rape when the consequence of a finding against the prisoner is death, and exclude the same evidence when the consequence is only loss of liberty ? I do not know whether the argument for the State holds that a distinction in this respect should be made. Certainly, the ingenuity and industry of the attorney-general have failed to point out any ground upon which evidence that would be inadmissible to prove rape upon the trial of an indictment for that crime alone, can be received to prove rape when charged' on the trial of an indictment for murder in the first degree, and relied on by the State as an essential element of that offence under the statute. And I confess it is impossible for me to imagine the shadow of a reason upon which such a claim could be sustained were it put forth. What, then, is the question presented by this exception ? Clearly, no other than this : Was evidence that the prisoner committed rape upon Julienne Rousse, in Canada, in 1871, legally admissible to show that he committed or attempted to commit rape upon Josie A. Langmaid, at Pembroke, in

1875 ?   There was no question as to the defendant's physical strength and ability to commit the crime of rape.   By no refinement, therefore, can *State* v. *Knapp*, 45 N. H. 148, be said to apply.   There is no room nor occasion to argue that the actual perpetration of rape upon one woman tends to show physical strength sufficient to commit the same crime upon another.   No such connecting link is in the case.   The simple naked question is that just stated, namely, Can evidence that he committed rape upon one woman be received as evidence from which the jury may find that he committed rape upon another ?—the two events being entirely independent and distinct,—no way connected in time, or place, or circumstances ; and we cannot, in my judgment, suffer that question to be changed in form, or to be covered up and disguised by vague and general observations as to the matter of intent, however astute and plausible, without imminent danger of losing our way in a wilderness of fallacy and error.   The answer to that question is to be sought for in the recognized authorities of the common law ; and I must say, that if there is any break in those authorities, any want of unanimity in the answer which they give, I have failed to discover it. Doubtless some of the cases to which we have been referred run pretty near the line.   But no court has yet said, to my knowledge, that the commission of one crime is legal evidence of the commission of another, when there is no connection of time, or place, or circumstance, or intent between the two, except that the commission of the first tends to show a heart capable of committing the second.

This very question was answered in the same way, as it seems to me, by the learned judge, when he said,—" It is a fundamental principle of law, that evidence that a defendant committed one offence cannot be received to prove that he committed another and distinct offence."

But it is nevertheless argued on behalf of the State (if I have not wholly misapprehended the drift of the argument) that the evidence was admitted because, *as matter of fact*, its natural tendency was to produce conviction in the mind that the prisoner committed rape upon his victim at the time he took her life.   The learned attorney-general says,—" The question of fact here is, whether, on those grounds of natural law, natural reason, and human experience, upon which such a question of fact must be decided, the intent with which the defendant assaulted Julienne Rousse is capable of affording any light on the intent with which he assaulted the deceased.   *   *   *   It will be admitted, I suppose, that every intelligent person, untrammelled by technical rules, will concur in the opinion of the circuit court.   And the question being one of pure fact unmixed with law, and therefore not subject to technical rules, on what ground will any one dissent from the unanimous judgment of the rest of mankind ? "   And further, that unanimous judgment " is the spontaneous and irreversible judgment of every grade of intellect that has appeared, or is likely to appear, in this state of existence.   It is an involuntary and unavoidable perception of the inherent and self-evident relations of conduct and intention, a mental revelation as natural as memory, and as trustworthy and unanswerable as consciousness."

I shall not undertake to deny this. If I know a man has broken into my house and stolen my goods, I am for that reason more ready to believe him guilty of breaking into my neighbor's house and committing the same crime there. We do not trust our property with a notorious thief. We cannot help suspecting a man of evil life and infamous character sooner than one who is known to be free from every taint of dishonesty or crime. We naturally recoil with fear and loathing from a known murderer, and watch his conduct as we would the motions of a beast of prey. When the community is startled by the commission of some great crime, our first search for the perpetrator is naturally directed, not among those who have hitherto lived blameless lives, but among those whose conduct has been such as to create the belief that they have the depravity of heart to do the deed. This is human nature—the teaching of human experience.

If it were the law, that everything which has a natural tendency to lead the mind towards a conclusion that a person charged with crime is guilty must be admitted in evidence against him on the trial of that charge, the argument for the State would doubtless be hard to answer. If I know a man has once been false, I cannot after that believe in his truth as I did before. If I know he has committed the crime of perjury once, I more readily believe he will commit the same awful crime again, and I cannot accord the same trust and confidence to his statements under oath that I otherwise should. Yet, does the law permit the credit of a witness to be impeached by showing individual acts of falsehood ? We do not and we can not believe a known liar the same as we believe a known man of truth. Why, then, ought not evidence showing that a witness has lied on any particular occasion to be received, in order that we may weigh the credit of his testimony by rules derived from human nature and experience, such as we naturally and instinctively apply in the other affairs of life?

Suppose the general character of one charged with crime is infamous and degraded to the last degree; that his life has been nothing but a succession of crimes of the most atrocious and revolting sort : does not the knowledge of all this inevitably carry the mind in the direction of a conclusion that he has added the particular crime for which he is being tried to the list of those that have gone before ? Why, then, should not the prosecutor be permitted to show facts which tend so naturally to produce a conviction of his guilt ? The answer to all these questions is plain and decisive : The law is otherwise. It is the law, that the prisoner shall be presumed innocent until his guilt is proved : it is the law, that his bad character shall not be shown by the State until he has put that matter in issue by attempting to show good character for himself : it is the law, that the credit of a witness shall not be impeached by showing specific instances of falsehood against him : and it is the law, that evidence of the commission of one crime shall not be received to show the commission of another when there is no connection between the two. Whether the law in this respect is wise or unwise, whether it accords with human reason and experience,

whether it affords too great protection to the criminal or too little to the community, are not questions with which we have to do. It has been thought, that to confront a man on trial for a crime that involves no more than his liberty and property with every act of his former life, and require him to purge himself from the suspicion of guilt which may be raised by the testimony of witnesses to individual instances of alleged wrong-doing, would be not only oppressive and unfair, but arbitrary and inhuman.

The rules of the common law in reference to the detection and punishment of crime, which are the growth of ages, and embody the practical wisdom and experience of many great and learned men, carry upon every page unmistakable evidence that they were devised as well to shield the innocent as to punish the guilty. Throughout they recognize the fact that innocent men may be accused of crime. A highly wrought condition of the public mind, the popular horror and indignation that arise upon the commission of a dreadful crime, are not favorable to the calm and dispassionate application of a just and humane law. They do not always leave the vision clear. But popular clamor, however loud, cannot be permitted to invade this place without imperilling the most sacred rights of the innocent as well as the guilty. The rule which we apply in the trial of a wretch who has ravished and killed an innocent girl, and then, with the incarnate spirit of a fiend, torn and cut and mutilated her body in a way that causes the blood to curdle and the heart to rise in almost uncontrollable rage, is the same rule which we must apply in the trial of the innocent victim of a wicked and audacious conspiracy, or of one who, without fault, has become entangled in a mesh of circumstances which threaten an innocent life.

I think the admission of the testimony of Julienne Rousse was error, because it violated the fundamental principle of law, that evidence that a defendant committed one offence cannot be received to prove that he committed another and distinct offence. The other exceptions, I think, should be overruled, for the reasons given by the attorney-general in his brief.

SMITH, J. The jury were instructed that the testimony of Julienne Rousse should be considered by them only so far as it might seem to them to bear upon the question whether Josie Langmaid was murdered by the prisoner (if they should find from other evidence that he did murder her) in perpetrating or attempting to perpetrate rape. The question at once arises whether her evidence had any legal tendency to prove the character of the homicide.

It was correctly stated by the presiding judge at the trial to be "a fundamental principle of law, that evidence that a defendant committed one offence cannot be received to prove that he committed another and distinct offence." There are seeming exceptions to this rule, as when guilty knowledge is an ingredient of the crime, or the intent with which a particular act is done is material. These exceptions have been very clearly classified by the chief-justice, and I shall not attempt to go over

the same ground, except incidentally, in what I may have occasion to say. The exceptions will all be found, I think, to be governed by principles that exclude this case from their operation.

The great objection to admitting such evidence is the injustice that would be done thereby, which is very forcibly stated by ALLEN, J., in *Coleman* v. *People*, 55 N. Y. 90 : " The general rule is against receiving evidence of another offence. A person cannot be convicted of one offence upon proof that he committed another, however persuasive in a moral point of view such evidence may be. It would be easier to believe a person guilty of one crime, if it was known that he had committed another of a similar character, or, indeed, of any character ; but the injustice of such a rule in courts of justice is apparent. It would lead to convictions upon the particular charge made by proof of other acts in no way connected with it, and to uniting evidence of several offences to produce conviction for a single one."

It is always competent for the government to introduce evidence of any facts tending directly to show an evil intent, or from which such evil intent may be justly and reasonably inferred ; but all proof in relation to transactions not intimately and directly connected with the particular accusation against the defendant, or with the evidence, or in necessary explanation of the evidence introduced in support of the charge contained in the indictment, is irrelevant and inadmissible. *Com.* v. *Tuckerman*, 10 Gray 198. In that case the rule is laid down, that such evidence should have a peculiar and intimate if not also an inseparable connection with, and tending to explain and characterize, the act in issue charged against the prisoner, and is only admissible on the question of intent.

So in *Com.* v. *Campbell*, 7 Allen 542, it was held that such evidence is inadmissible where the offence charged and that offered to be proved are distinct.

In our own case of *State* v. *Renton*, 15 N. H. 174, it was very clearly held that it is not competent to show that the respondent had a tendency to commit the offence with which he was charged.

The charge made by the State is, that this respondent killed the deceased in perpetrating or attempting to perpetrate a rape upon her. As having some tendency to show that he committed or attempted to commit a rape upon Josie Langmaid, the State was permitted to show that four years and more previously he had committed a rape upon Julienne Rousse, in Canada. Had the testimony any such tendency ? There was obviously no connection whatever between the two offences or transactions, either in the persons upon whom the crimes were committed, or in the places where or times when committed. The evidence of Julienne Rousse, at most, would only show that the respondent was depraved enough to commit the crime of rape, or that he possessed a lustful desire in his heart which he on that occasion did not hesitate to gratify by violent means.

But how does the fact that the respondent committed a rape more than four years previously, in Canada, upon another person, have any ten-

dency to show the intent with which he killed Josie Langmaid? It is not claimed that he killed her to enable him to commit a rape: the rape preceded the killing, and the killing was done to conceal the rape.

Suppose the respondent had committed only the crime of rape upon Josie Langmaid, and then had spared her life: I think no case can be found that would authorize the State, upon the trial of an indictment against the respondent for the rape, to give in evidence the rape committed upon another person more than four years previously. No case of a more marked and distinct offence, as to time, place, victims, and circumstances, can be found. How, then, does such evidence become any more relevant when the trial is upon an indictment for killing while committing a rape?

Lord MANSFIELD has expressed the rule in these apt words: " When an act, in itself indifferent, becomes criminal if done with a particular intent, then the intent must be proved and found; but when the act is in itself unlawful, the proof of justification or excuse lies on the defendant; and in case of failure thereof, the law implies a criminal intent."

Thus, upon the charge of passing counterfeit money, proof that the respondent knew it was counterfeit is necessary, as showing the intent with which it was passed. Upon the charge of obtaining goods under false pretences, proof of fraudulent intent is necessary. Upon the charge of murder, the killing being proved, the malice is implied in the absence of any explanation by the prisoner of the act. In this case there was no connection whatever between the rape of Julienne Rousse in 1871 in Canada, and the murder of Josie Langmaid in New Hampshire in 1875. There can be no pretence that they are continuous parts of one transaction; that when the rape was committed upon Julienne Rousse, in 1871, the prisoner had any design to commit a rape upon or to murder Josie Langmaid, or any other woman, in 1875. The two acts are so wholly distinct and separate, that when the prisoner formed the design of committing a rape upon Julienne Rousse, and carried that design into effect in 1871, he did not and could not, as a part of that evil design and act, or as a consequence thereof, have then premeditated the murder of Josie Langmaid, or the perpetration of rape upon her.

No point is better settled than that the State cannot give evidence of the bad character of the respondent, unless he shall first put his character in question by introducing evidence in support thereof. As the only effect of the State's introducing evidence of another rape by the respondent is that it tended to show that he possessed a disposition to commit that particular crime, a disposition which would incline him to the perpetration of rape whenever the opportunity might occur, how does such testimony differ from that of evidence as to the prisoner's bad character, before he has elected to put it in question, and that too by introducing proof of an isolated fact?

The whole answer to the position, that the evidence of Julienne Rousse was relevant to the issue tried, is, that it does not show or

tend to show that the prisoner perpetrated or attempted to perpetrate a rape upon Josie Langmaid. Proof that he committed a rape in Canada, four years previously, upon Julienne Rousse shows what? Not that he then had any design or intent to perpetrate a rape four years afterwards upon another woman whom he had never seen or heard of, or in a place two hundred miles distant where he never had been; not that he had then formed a design to rape and murder women whenever he might have opportunity; not that he had ever before or since committed that crime,—but that the defendant had a disposition to commit the crime of rape four years previously. No one will pretend that evidence that the prisoner had committed another murder, in Canada, or Texas, or Europe, could be shown on this trial. One cannot be convicted of murder, by showing that he has at some time and somewhere else committed another murder; or of larceny, by showing that he has committed the crime before, and therefore has an evil disposition inclining him towards that particular crime.

The trouble with the position of the State is, that it is not a question of *motive* or *intent*. Certainly, committing a rape in Canada in 1871, would not not show any motive for committing a rape in New Hampshire in 1875; nor does it disclose any intent so to do. Evidence tending to prove collateral facts is admissible only when it has a natural tendency to establish the fact in controversy, or to corroborate other direct evidence in the case. *Com.* v. *Merriam*, 14 Pick. 518. So, in *Com.* v. *Ferrigan*, 44 Pa. St. 386, in a trial for murder, evidence that an adulterous intercourse between the wife of the deceased and the prisoner had existed and continued to near the time of the homicide was received, on the ground that one crime furnished a motive for the other. In *People* v. *Wood*, 3 Parker Crim. Cas. 681, which was a trial for murder, proof of other crimes than that alleged, *but connected with it by unity of plot and design*, and influenced by a single motive, was held admissible.

In *State* v. *Renton*, 15 N. H. 174, GILCHRIST, J., very aptly remarked,— " Where a person is charged with an offence, it is important to him that the facts laid before the jury should consist exclusively of the transaction which forms the subject of the indictment, which alone he can be expected to be prepared to answer. It is therefore not competent for the prosecutor to give evidence of facts tending to prove another distinct offence, for the purpose of raising an inference that the prisoner has committed the crime in question. Nor is it competent to show that he has a tendency to commit the offence with which he is charged. Thus, on a prosecution for an infamous offence, an admission by the prisoner that he had committed such an offence at another time was held to have been properly rejected. *Rex* v. *Cole*, cited 1 Ph. on Ev. 499 (8th ed.). The case of the respondent is to be tried upon its own merits. * * * It is argued that reference may be made to what was done on a former day, that this transaction may then be compared with that, and thus may acquire a certain character. But then, if found guilty, he would be so, not so much because what he did

was wrongful in itself, but because his conduct on this occasion was like his conduct on some previous occasion.  \*  \*  \*  By comparing one with the other, we establish the guilt of the respondent by arguing in a circle. But this is to be shown by proof of what he did on the present occasion."

So, in. *East Kingston* v. *Towle*, 48 N. H, 57, which was an action against the owner of a dog alleged to have been concerned in killing sheep, PERLEY, C. J., said (p. 65),—" We are not acquainted with any rule of evidence which will allow the character of the dog, or the fact that he had killed or worried sheep before, to be admitted as evidence that he did the damage complained of in this suit. To show that he did this mischief, it is not competent to prove that he had done similar mischief before, more than it would be to prove that a defendant sued for an assault and battery had beaten other men before, or the same man."

In *State* v. *Prescott*, 33 N. H. 212, which was an indictment for keeping a gaming-house, the allegation in the second count was confined to a single day; and it was held that the government could not prove, for the purpose of charging the defendant on that count, that the crime was committed on more than one day, although evidence covering a longer time would be admissible for the purpose of showing what character the house had on the particular day when it was sought to prove that the offence was committed.

In *State* v. *Wentworth*, 37 N. H. 197, evidence that the prisoner placed on the railroad track obstructions other than those for which the indictment was found was held competent, upon the ground that the acts were so connected that they might be regarded as being the continuation of the same transaction. But the fundamental rule, that the evidence of another distinct offence could not be shown for the purpose of raising an inference that the prisoner has committed the crime with which he is charged, was distinctly recognized.

The testimony of the other witnesses excepted to is free from the objection made to that of Julienne Rousse. They all testified to facts which tended to show that the respondent was forming in his mind a plot to commit the crime of rape upon some one in the vicinity of the place of this homicide. No lustful desire or particular animosity or malice against Josie Langmaid need be shown. She became the victim of his lustful passion, and his evil designs were consummated in the attack which deprived her of life.

But because of the admission of the testimony of Julienne Rousse, there must be

*A new trial granted.*